**In re Tom Stanley NEFF, Debtor.**

**Bankruptcy No. 184–10009.**

United States Bankruptcy Court,
N.D. Texas,
Abilene Division.

April 4, 1985.

James C. Gordan, McMahon, Smart, Surovik, Suttle, Buhrmann & Cobb, Abilene, Tex., for debtor.

Karla Sexton, Asst. U.S. Trustee, Lubbock, Tex., for Small Business Admin.

Tommy Swann, Lubbock, Tex., for Sweetwater Production Credit Ass'n.

Nancy Koenig, Asst. U.S. Atty., Lubbock, Tex., for U.S.

## MEMORANDUM OPINION REGARDING CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION

MICHAEL A. McCONNELL, Bankruptcy Judge.

On January 12, 1984, Tom Stanley Neff ("Neff" or "the Debtor"), an individual engaged in the business of farming and ranching in Mitchell County, Texas filed a Petition for Reorganization under Chapter 11 of the Bankruptcy Code. Approximately one year later, Neff presented a plan to the Court for repayment of his debts which Neff now asks the Court to confirm.

### Factual Background

The events and conditions which led to the filing of this Chapter 11 have a haunting familiarity to other farming and ranching failures in this area in recent months. As recently as 1980, Neff had paid off his then-existing debt to the Sweetwater Production Credit Association and was enjoying what might be described as the peak of his financial condition. Cotton sold for approximately eighty cents per pound and

cattle of the kind raised by the Debtor was selling for approximately seventy-two cents per pound. In 1981, however, the price of cotton plummeted to approximately thirty-eight cents per pound.

Because of the precipitous decline in the price of cotton and cattle, Neff was forced to resort to additional financing from the Sweetwater Production Credit Association and the Small Business Administration while continuing to service significant debt incurred in purchasing the real property he owns.

By January 1984, Neff's financial condition had continued to deteriorate to the point that the Sweetwater Production Credit Association had given notice of its intent to foreclose on all the real property securing its debt and the First State Bank of Abilene had advised Neff that he must face foreclosure on his horses. In the face of this pressure, Neff was finally forced to seek the protection of this Court under Chapter 11 of the Bankruptcy Code on January 12, 1984.

### Neff's Plan of Reorganization

Following several preliminary legal skirmishes between Neff and his creditors including motions for the appointment of a trustee, motions for relief from the automatic stay [1] and motions seeking the use of cash collateral, Neff filed a proposed Plan of Reorganization and accompanying Disclosure Statement on October 22, 1984. As stated in Neff's Amended Disclosure Statement, the basic premise of the Plan is that Neff will retain his property, restructure his liabilities and liquidate a portion of the horses and real property owned by the estate so that he may satisfy his current

and restructured debt out of future earnings from continued farming and ranching operations in Mitchell and Dickens Counties, Texas.

Neff will use proceeds from the 1984 crop year to pay all costs of administration and priority claims and to reinstate and bring current the claims in Classes 5, 6 and 7. At the same time, Debtor will liquidate a sufficient number of the horses constituting a part of the estate as necessary to satisfy the Class 3 claim.

Debtor will also sell the 2,524 acres in Dickens County, Texas, at the earliest possible time, either subject to the purchaser's assumption of the Connecticut General note and the curing of all defaults and delinquencies thereunder, or by satisfaction of the Connecticut General claim in full. All net proceeds will be applied against the principal amount of the Sweetwater PCA claim.

Performance of the Plan will take place over a five year period after confirmation. At the end of each year of the Plan Debtor will account to the Sweetwater PCA and the Small Business Administration for the net profits, if any, from farming and ranching operations and Debtor will be obligated to use those proceeds to reduce and pay the Sweetwater PCA claim. At the same time, a portion of net profits will be used to pay that portion of the Small Business Administration claim that is unsecured and the Class 11 unsecured creditors (pro rata) on an annual basis. The unsecured creditors with claims less than $2,000.00 will be paid in full in cash on the effective date of the Plan.[2]

In essence, the Debtor is asking for a five year "breathing period" in which to

---

1. On November 15, 1984, this Court entered an Order denying Sweetwater PCA's motion for relief from the automatic stay conditioned upon certain "adequate protection" remedies. Should these adequate protection remedies prove to be insufficient, Sweetwater PCA will be entitled to an administrative priority claim to the extent of the shortfall under Section 507(b) of the Code.

2. The "effective date of the Plan" as defined in the Plan means the date thirty (30) days after the date on which this Order of Confirmation is

no longer subject to appeal or certiorari proceedings and on which date no such appeal or certiorari proceeding is then pending and on which date all of the conditions to the effectiveness of the Plan expressly set forth in the Plan have been satisfied fully or effectively waived and particularly, that date on which the cotton and cattle crops for the year 1984 have been sold and proceeds realized by the Debtor available for distribution as provided under the Plan.

liquidate in an orderly manner sufficient assets to repay his pre-petition creditors the full amount of their claims. In return for this grant of additional time, the Debtor promises to pay interest on his secured claims at market rates in five annual installments and to pay his unsecured creditors a 10% dividend on their claims in five equal annual installments.

### The Confirmation Hearing

On December 18, 1984, the Court held a confirmation hearing on the Debtor's proposed Plan of Reorganization. The Sweetwater Production Credit Association (Class 8) and the Perry Bowles Estate voted against confirmation of the plan and filed timely objections to confirmation. All other classes voted in favor of the plan or were deemed to have accepted the plan by their failure to vote such as the Small Business Administration. After the evidentiary hearing required by Section 1128 of the Code, the issue of confirmation was taken under advisement; and on January 4, 1985 the Court ruled that two major infirmities precluded confirmation of the plan as proposed including the Debtor's attempt to remove the "cross-collateralization" features of the liens securing the indebtedness to the Sweetwater Production Credit Association and the below market rate of interest offered.

The Debtor then filed a proposed modification of the Plan of Reorganization under Section 1127 of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules, and a hearing on the plan, as modified, was held on February 15, 1985. Immediately following the hearing, the Court entered an Order confirming the Plan of Reorganization.

Following entry of the Order of Confirmation, Sweetwater Production Credit Association and the Small Business Administration filed Notices of Appeal of the Order of Confirmation to the District Court. The purpose of this Memorandum Opinion is to supplement the Court's Order of February 15, 1985 and to set forth its Findings of Fact and Conclusions of Law in conformity with the Rules of Bankruptcy Procedure.

### Confirmation Standards and Procedures

As stated in 6 *Collier on Bankruptcy* ¶ 1129.01, Section 1129 of the Bankruptcy Code contains the conditions for confirmation of a plan of reorganization under Chapter 11 of the Code. Section 1129(a) includes eleven conditions precedent to confirmation. These conditions are as follows:

1. The plan must comply with all applicable provisions of Chapter 11;

2. The proponent of the plan must comply with all applicable provisions of Chapter 11;

3. The plan must be proposed in good faith and not by any means forbidden by law;

4. Any payment made or promised for services rendered or for costs and expenses incurred in connection with the case or the plan must be disclosed and such payments must be determined to be reasonable or must be subject to approval by the court.

5. The identity and affiliation of proposed directors, officers, or voting trustees must be disclosed as well as the identity of an affiliate of the debtor participating in a joint plan or a successor to the debtor under the plan. The proposed appointments of directors, officers, or voting trustees must be consistent with both the interest of creditors and equity security holders and with public policy. In addition, the proponent of the plan must disclose the identify of any "insider" of the debtor that will be employed or retained by the reorganized debtor and the nature of compensation which will be paid to such person;

6. If the debtor is regulated company and the plan proposes to alter rates over which a regulatory commission has jurisdiction, such commission must have approved such rates or any proposed rate change must be conditioned on such approval;

7. In the absence of unanimous consent of a class, the class must receive under the plan at least what such class would

receive in a liquidation under Chapter 7 of the Code. If, however, the class exercises the section 1111(b)(2) election, the class must receive property with a present value equal to the value of the class' secured claims;

8. Each class must accept the plan or be unimpaired;

9. Unless the holder of a priority claim agrees to less favorable terms, administrative claims entitled to priority must be paid in cash on the effective date of the plan; employee claims, pension benefit claims, and consumer claims entitled to priority must be either paid in cash on the effective date of the plan or must be paid in full over time according to terms acceptable to the requisite majority of the particular class; tax and customs claims entitled to priority must be paid in full but payments in respect of such claims may be extended over a period not to exceed six years from the date of assessment of such claims as long as the present value of the payments as of the effective date of the plan equal or exceeds the amount of those claims;

10. At least one impaired class of claims must accept the plan; and

11. The plan must be feasible. The Code defines this to mean that the plan is not likely to be followed by liquidation or further reorganization of the Debtor.

■ In the majority of cases, if all of the above requirements are met, the plan should be confirmed. But if all of the requirements for confirmation of a plan of reorganization have been met, except that one or more classes of claims or interests have not accepted the plan, then confirmation can occur only by invoking the "cram-down power" of Section 1129(b). In those circumstances, the Code permits the proponent of the plan to request the court to confirm the plan, notwithstanding the failure of one or more "impaired" classes to accept the plan. If certain protective conditions are met with respect to classes that are impaired and have not accepted the plan, then the Court should confirm the plan. Klee, *"All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,"* 53 Am.Bankr.Law J. 133 (1979).

### Best Interests of Creditors Test

■ Section 1129(a)(7) of the Bankruptcy Code further provides that a plan of reorganization must be in the "best interests" of creditors. In general, this means that creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the plan. The plan proponent must introduce sufficient current financial information about the Debtor, his assets and liabilities, and his prospects to permit the Court to judge whether this standard has been satisfied. *In Re Featherworks Corp.,* 25 B.R. 634 (Bankr.E.D.N.Y.1982); *In Re Western Management, Inc.,* 6 B.R. 438 (Bankr.W.D. Ky.1980).

In the Amended Disclosure Statement on file in this case, the Debtor estimates that the total liquidation value of all assets of the estate is approximately $2,989,055.00. These assets were enumerated as follows:

ASSETS

REAL PROPERTY

| | | Estimated Value |
|---|---|---|
| 1. | 320 acres in Block 19, Lavaca Navigation Co. Survey, Mitchell County, Texas | $ 128,000.00 |
| 2. | 280.53 acres in Sections 8 and 9 of Block 19, Lavaca Navigation Co. Survey, Mitchell County, Texas | 112,212.00 |
| 3. | Four tracts of land in Sections 46, 47 and 49, Block 26, T&P Ry. Co. Survey, Mitchell County, Texas, totaling 604.57 acres | 362,742.00 |
| 4. | 2425 acres in Dickens County, Texas | 757,200.00 |
| 5. | Debtor's residence in Colorado City, Mitchell County, Texas | 90,000.00 |
| 6. | Lot and house in Indian Hills Subdivision, Ruidoso, Lincoln County, New Mexico | 90,000.00 |

PERSONAL PROPERTY

| | | |
|---|---|---|
| 1. | Farming and ranching equipment | 582,151.00 |
| 2. | Vehicles | 64,750.00 |
| 3. | Cattle | 167,000.00 |
| 4. | Household furnishings and clothing and jewelry, Colorado City and Ruidoso, New Mexico | 35,000.00 |
| 5. | Horses | 600,000.00 |
| | TOTAL APPROXIMATE VALUE OF ASSETS | $2,989,055.00 |

Total liabilities were estimated to be $2,921,541.13. This evaluation does not

take into consideration the fact that in a Chapter 7 liquidation proceeding the creditors would only be able to look for recovery to non-exempt property for payment of claims with certain exceptions for purchase money liens, etc.

■ In the event of an immediate Chapter 7 liquidation, the Court finds that the secured creditors of the estate might be able to satisfy their claims through foreclosure, but that the forced sale of real property and horses which constitute the bulk of the assets of the estate would probably result in significantly lower values than those values which might be realized over time, especially in view of present economic conditions. The unsecured creditors, therefore, would suffer significant harm. Accordingly, the Court finds that the requirements of Section 1129(a)(7) have been met and that the proposed Plan of Reorganization represents the best method for the realization of maximum return to both secured and unsecured creditors of the estate.

## Feasibility of the Plan

Section 1129(a)(11) requires the Court to make a specific finding that the Plan is "feasible"—*i.e.* not likely to be followed by liquidation or further reorganization. At the confirmation hearing, the Debtor presented extensive evidence on the projection of income for the 1984 crop year and a projection of future income and expenses for the years 1985 and beyond. These projections were summarized on Exhibit 1 of the Debtor's Final Arguments and Authorities in Support of Confirmation:

PROJECTION OF INCOME
1984 CROP YEAR

| | | |
|---|---|---|
| 1. | Cotton (Dickens County only) | $375,000.00 |
| 2. | Government deficiency payments to Tom & Mickey Neff | 100,000.00 |
| 3. | Cattle sales | 170,000.00 |
| | | $645,000.00 |

All expenses of operation are paid within 30 days of incursion.

PROJECTION OF INCOME
1985 AND SUBSEQUENT YEARS

| | | |
|---|---|---|
| 1. | Cotton (Dickens County leased land plus Mitchell) | $337,500.00 |
| 2. | Wheat | $ 30,000.00 |
| 3. | Government deficiency payments to Tom & Mickey Neff | 100,000.00 |
| 4. | Cattle sales | 170,000.00 |
| | | $637,500.00 |

ORDINARY COURSE CASH NEEDS/OPERATING
EXPENSES
1985 AND SUBSEQUENT YEARS

| | | |
|---|---|---|
| Class 1 | | .00 |
| Class 2 | – Tax claims | 14,000.00 |
| Class 3 | | .00 |
| Class 4 | | .00 |
| Class 5 | – Bowles Estate and American Amicable | 6,500.00 |
| Class 6 | – Snyder Savings & Loan Association | 1,284.00 |
| Class 7 | – John Deere Co. | 20,726.00 |
| Class 8 | – Sweetwater PCA | 124,985.00 |
| Class 9 | – SBA | 37,807.00 |
| Class 10 | | .00 |
| Class 11 | | 25,089.00 |
| | | $230,391.00 |
| Operating Reserve | | 265,000.00 |
| | | $495,391.00 |

Sweetwater PCA contends that Neff grossly understates his expenses for future years and grossly overstates his projected income for future years. On balance, the Court finds that these projections, although highly speculative in nature, are based upon past performance of the Debtor and a reasoned analysis of future operations. Similar claims of infeasibility were made and rejected in *In Re Fursman Ranch,* 38 B.R. 907, 912 (Bankr.W.D.Mo.1984) where the court commented on the inherent problems of making a finding of feasibility in farmer bankruptcies:

"In a farm economy, projections over long periods of time are treacherous. Markets are subject to wide swings. Weather is never predictable. Government programs come and go. The wheat PIK was for one year but may be extended. Other support programs vary only as to amount. Some hazards can be guarded against by, for example, the purchase of crop failure insurance. In this particular case long term loans went into default after only four years."

## The Concept of Impaired Classes and Voting

The requirements of Section 1129(a)(8) and (a)(10) are interrelated. Section 1129(a)(8) requires that every class of credi-

tors impaired by the plan must have accepted it to confirm a Plan without resort to cram down. Satisfaction of this provision is not necessarily a prerequisite to confirmation; the plan may be forced by the cram down powers contained in Section 1129(b) on descending classes of creditors in certain circumstances.

Section 1129(a)(10) requires that *at least* one class of impaired creditors must have accepted the plan to allow the Debtor to invoke the cram down powers of 1129(b). The concept of when a class is "impaired" or when a class is "unimpaired" is vital. It is necessary to know whether a class that has not voted for acceptance of a plan is impaired or unimpaired under the plan. A class that is not impaired is deemed to have accepted the plan. On the other hand, a class that has not voted for acceptance and is impaired is, what is called for convenience, a "dissenting" class. If a class dissents, special protective conditions must apply in order for a plan to be confirmed.

As set forth in Kenneth Klee's article, *"All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code", supra,* "the Code specifies in Section 1124 that a class of claims or interests is impaired under a plan unless at least one of three separate standards is met with respect to each claim or interest in the class. First, the plan may leave unaltered the legal, equitable, and contractual rights to which the holder of the claim or interest is entitled. If this is done, the class is not impaired and consent of the class is not necessary to confirm the plan. Second, the plan may permit the proponent of a plan to negate an acceleration clause as a matter of law without the approval of any other party. The statute accomplishes this by providing, in essence, that the plan may cure defaults and reinstate a claim or interest without otherwise altering the holder's legal, equitable, or contractual rights. In particular the maturity of the claim or interest must be reinstated as it existed before the default. The plan must compensate the holder of the claim or interest for any damages "incurred as a result of any reasonable reliance" by the holder on an acceleration clause. Third, the plan may provide for the holder of a claim to receive cash on the effective date of the plan equal to the allowed amount of the claim. Alternatively, if applicable, the plan may provide for the holder of an ownership interest to receive cash on the effective date of the plan in the amount of any fixed liquidation preference or redemption price, whichever is greater. The effect of this standard is to permit confirmation of a plan without the active consent of a class of claims or interests, if the class is paid cash in an amount that is normally the full amount of the debt owed."

Neff has divided his creditors into eleven classes which are set forth in the Debtor's First Amended Plan of Reorganization as follows:

*Class 1.* All costs of administration in this case, including debts incurred by the Debtor-in-Possession, since the filing of this case and all fees and allowances to attorneys, accountants and otherwise approved by the Court pursuant to 11 U.S.C. § 507(a)(1).

*Class 2.* All other claims entitled to priority pursuant to 11 U.S.C. § 507(a) other than those set forth in Class 1 above, including all claims for ad valorem taxes on property owned by the estate.

*Class 3.* First State Bank of Abilene, Texas, holder of a first lien on horses belonging to the estate securing a note in the amount of $228,000.00.

*Class 4.* Connecticut General Life Insurance Company, the holder of a first lien on the 2,524 acres in Dickens County, Texas, securing its claim in the approximate amount of $300,000.00.

*Class 5.* The Perry Bowles Estate and American Amicable Life Insurance Company. These creditors have first liens on property of the estate located in Mitchell County, Texas, securing their claims in the respective amounts of approximately $55,000.00 and $4,625.00.

*Class 6.* Snyder Savings & Loan Association, the holder of a first lien on the

Debtor's homestead in Colorado City, Mitchell County, Texas.

*Class 7.* The John Deere Company, holder of a first lien on certain equipment securing its claim in the present amount of approximately $30,000.00.

*Class 8.* The Sweetwater Production Credit Association, the holder of first liens as to Debtor's cattle, a majority of Debtor's equipment and vehicles, and second liens as to the remainder of equipment and the real property in Dickens and Mitchell Counties, Texas, securing its claim in the principal amount of approximately $1,600,000.00.

*Class 9.* The Small Business Administration, holder of a security interest in a note assigned by the Debtor in approximately the amount of $100,000.00 and third liens in portions of the estate's property in Mitchell County, Texas, securing its claim in the principal amount of approximately $483,000.00.

*Class 10.* All unsecured creditors holding claims of less than $2,000.00.

*Class 11.* All other unsecured creditors holding claims in excess of $2,000.00.

In the instant case, the Court finds that the following classes *are not impaired* under the plan as "impairment" is defined in Section 1124 of the Code: Administrative Costs, Class 1; Priority Debts, Class 2; First State Bank of Abilene, Class 3; Connecticut General, Class 4; the Bowles Estate and American Amicable Life, Class 5; Snyder Savings and Loan, Class 6; the John Deere Company, Class 7; and the small claims "administrative convenience" class specifically permitted by Section 1122(b) of the Code. Classes 8, 9, and 11 are impaired under the plan.

An evaluation of the ballots indicates that Class 11, an impaired class, has affirmatively accepted the plan. Class 9, the secured portion of the Small Business Administration claim, is deemed to have accepted the Plan by its failure to vote. Further, classes 2, 3, 5 and 7 have affirmatively voted to accept the plan, notwithstanding that the Plan contemplates that those classes are unimpaired. Because class 11, an impaired class, has affirmatively accepted the plan, the requirements of Section 1129(a)(10) have been met.

However, the Sweetwater Production Credit Association, Class 8 has rejected the plan, so the Court must now turn to the cram-down requirements of Section 1129(b) before confirmation of the Neff Plan can be approved.

### *Cram-Down on Secured Creditors—11 U.S.C. § 1129(b)(2)(A)*

A plan can be forced on or "crammed down" on a class of secured creditors which rejects it if:

1. The holders of the secured claims in the class will continue to have a lien in the property subject to the lien whether that property is retained by the reorganized Debtor or transferred by it.

2. The holders of the secured claims in the class are to receive deferred cash payments under the plan totalling at least the allowed amount of the secured claim and of a present value at least equal to the value of the lien such holders have.

3. The holders of the secured claims receive the "indubitable equivalent" of their secured claim.

In general, the Debtor desiring to retain property subject to valid liens for a reorganization under Section 1129 can do so *provided that* (1) the Debtor has sufficient cash to pay off the secured debt in full; (2) the Debtor can negotiate the secured creditor into a bifurcated claim by the prospects of a better return on any unsecured deficiency under the plan; or (3) the Debtor has sufficient financial strength and future cash flow to establish that it can handle the increased debt service on a restructured, extended pay-out to the secured creditor. The last option requires restructuring in which the secured creditor can require total cash payment equalling his debt and also principal amount, amortization, and interest rates which will discount back to the present value of his

collateral. Finally, the Debtor may offer the secured creditor the "indubitable equivalent" of his claim. 10 *Broken Bench Review* 69, October 1983.

### The Claim of Sweetwater PCA

■ Because Class 8 (whose sole member is the Sweetwater Production Credit Association) voted against acceptance of the Plan of Reorganization, the plan of reorganization cannot be confirmed unless the "cram-down" provisions of Section 1129(b) have been met. The Plan of Reorganization provides that the Sweetwater Production Credit Association will retain all of its liens in (1) all of the Debtor's equipment and vehicles in which the Sweetwater Production Credit Association had a lien prior to the filing of this case, plus a replacement lien for any equipment purchased after the effective date of the plan, to provide adequate protection against depreciation; (2) the 450 to 500 head of cattle presently owned by the estate; and (3) the land in Mitchell and Dickins Counties, Texas. The Court further finds that for voting purposes the secured claim of Sweetwater Production Credit Association is approximately $2,147,382.00 and is fully secured.

The Debtor proposes to pay 100% of the secured portion of the Sweetwater Production Credit Association claim as follows. Neff will create a reserve for 1985 operating expenses and for taxes anticipated to be due and owing for 1984 income out of the proceeds from crops and cattle sold for the 1984 crop year. Additionally, the crop proceeds will be used to pay those classes of creditors entitled to payment at or immediately after confirmation. The remaining proceeds remaining after the creation of the reserves and the immediate payments will be applied to the Sweetwater Production Credit Association debt.

■ The principal amount of the Sweetwater Production Creditor Association

claim remaining after the payment from crop proceeds of 1984 will be calculated by the value of the property securing the Sweetwater Production Credit Association as of the date the Plan is confirmed (approximately $2,147,382.00 as of November 15, 1984). The debt will be evidenced by a new note to be executed by Debtor and will be secured by all of the property in which the PCA has a presently existing valid lien, with the exception of the Ruidoso home. The note will be in the amount equal to the equity available to PCA in the properties securing the note. The PCA's claim for interest in excess of the value of property securing its claim is not recoverable under the Bankruptcy Code.

Neff will be obligated to make an annual payment on the secured note in at least the amount of interest which accrues on the principal amount of the note at a floating rate equal to the floating rate charged by the PCA to all its customers. At the end of the fifth full year after confirmation, all unpaid principal will be due in full as a "balloon payment" to the PCA.

During the five years after confirmation, Debtor shall have the right to seek permission to sell any of the properties securing the PCA secured note free and clear of liens as permitted by Section 1123(a)(5)(D) of the Code. The PCA's lien shall attach to any proceeds from such sale. Any unsecured portion of the claim will be paid on the same basis and in the same proportion as the claim of all Class 11 unsecured creditors.

■ As stated previously, Section 1129(b) allows a debtor to cram down a plan over the objection of a secured creditor if the secured creditor will receive deferred cash payments under the plan of a present value at least equal to the value of its collateral. As noted by Judge Lavien in *In Re Fi-Hi Pizza, Inc.*, 40 B.R. 258, 11 BCD 1209 (Bankr.D.Mass.1984)[3]:

> Chapter 11 debtors could obtain. Recent cases are discussed in detail and the opinion contains a useful exposition of the mathematical formulas used in computing present value.

---

**3.** Judge Lavien held that the interest rate on deferred taxes under a plan should be computed at 26 U.S.C. § 6621 prime-based rate, plus 2.5 percent additional interest to compensate for added risk, since prime is "a rate few if any

"In any case, the critical term to be analyzed is the elusive phrase "present value," also known as present discounted value. Present value is not necessarily a legal concept, but rather a term of art used by the economic and financial communities. *In Re Fisher*, 29 B.R. 542, 543 (Bankr.D.Kansas 1983). One author has defined it as:

'the value today of a future payment or stream of payments, discounted at the appropriate discount rate.'

Brigham, Financial Management Theory and Practice, 916 (1st Ed.1977); *see also*, Samuelson, Economics 596, 613–14 (9th Ed.1973); *In Re Fisher*, 29 B.R. 542, 543. Put another way, present value reflects the financial reality that a dollar that is received in the future, is not worth the same as a dollar in hand today. Not only does inflation deflate the value of what a dollar may purchase in the future, but a party that has a dollar today may invest it in a variety of investments that would yield a return."

The factors relevant to determining an appropriate (discount) interest rate are catalogued in 5 *Collier on Bankruptcy*, ¶ 1129.03, at 1129–65 (1982) as follows:

"The appropriate discount (interest) rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount (interest) rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default."

■ In the instant case, the Court finds that a floating rate of interest equal to the rate charged by Sweetwater PCA on all of its loans to other customers will give the PCA the "present value" of its claim, and, therefore, the Plan can be crammed down on the PCA over its objections. Moreover, in any event, the Court specifically finds that Sweetwater PCA has been given the "indubitable equivalent" of its claim.

### The Claim of the Small Business Administration

Class 9 (whose sole member is the Small Business Administration) also seeks to reject the Plan although as discussed below the rejection was untimely and therefore ineffective. The Small Business Administration is the holder of a security interest and a note assigned by the Debtor in the approximate amount of $100,000.00 and third liens in portions of the estate's property in Mitchell County, Texas, securing its total claim in the principal amount of approximately $483,000.00. The Debtor proposes that the SBA will retain its lien and security interest in the note from the Yates farm and will be permitted to foreclose upon the property securing the Yates farm notes provided that the SBA enters into a protected bid in at least the amount then owing under the Yates farm note and all attorney's fees and expenses incident to foreclosure. The unsecured remainder of the SBA claim in approximately the sum of $383,000.00 will be paid on the same basis and in the same proportion as all unsecured creditors in Class 11.

■ The Small Business Administration has raised a number of objections to Neff's proposed Plan of Reorganization including improper classification of its secured and unsecured claims in violation of the requirements of Section 1122 of the Code. The Court finds, however, that the Small Business Administration has no standing to assert these objections. On November 20, 1984, the Court approved the Amended Disclosure Statement of Neff and fixed December 14, 1984 as the last day for filing and serving objections to confirmation of the Plan pursuant to Rule 3020(b)(1) of the Bankruptcy Rules and also set December 14, 1984 as the last date for filing written acceptances or rejections of the Plan.

■ The Small Business Administration, however, failed to file a timely acceptance or rejection of the Plan or a timely objection to confirmation prior to December 14, 1984. Therefore, because the Small Business Administration failed to vote, Class 9 (whose sole member is the Small

Business Administration) is deemed to have accepted the Plan and its unsecured claim which would have been counted in the votes in Class 11 (see, Rule 3018(d) of the Bankruptcy Rules) cannot be counted in determining the acceptances or rejection of Class 11.[4]

Since the unsecured portion of the SBA claim in the amount of $383,000.00 cannot be counted in determining acceptances or rejections of Class 11, Class 11 (an impaired class) has affirmatively voted in favor of the Plan fulfilling the requirements of Section 1129(a)(10).

Because the Court has found that the cram down provisions of Section 1129(b) have been met with respect to the rejecting Class 8 and Class 9 has been deemed to accept the plan by its failure to vote, the Court finds that all requirements of Section 1129(a) and (b) have been met and finds as a matter of fact and law that Neff's proposed Plan of Reorganization should be confirmed.

The terms of Neff's proposed Plan of Reorganization are remarkably similar to the terms of the plan confirmed in *In Re Hollanger*, 15 B.R. 35 (W.D.La.1981) where the Court was faced with objections from dissenting classes of secured claimants and the farmer debtor was able to confirm the plan over their objections through use of the cram down provisions of Section 1129(b). The Court noted at page 47 that:

"Once again, it should be noted that the Debtors' plans provide generally that all secured creditors will be paid after confirmation and generally within seven years thereafter. Certain arrearages and mortgage payments will be deferred until the end of the seven year period; but there is provided an appropriate discount rate for the deferred payments. Thus, creditors will be receiving deferred cash payments totalling at least the amount of their debts and having a current value equal to the value of their lien collateral and retaining their lien in the collateral for the full amount of their debts which are secured, all within Section 1129(b)(2)(A)(i). Unsecured creditors are receiving full payment over seven (7) years. Therefore, each creditor (both secured and unsecured) will be receiving full satisfaction of their claim and retaining whatever collateral is held, which appears to meet the requirements of Section 1129(b) of the Bankruptcy Code."

CONCLUSION

Section 1129 of the Bankruptcy Code sets forth very clear and precise requirements for the confirmation of any proposed plan of reorganization under Chapter 11. The Court has examined the record in the instant case and finds that all requirements of Section 1129(a) have been met. The Court further finds that all conditions precedent to invoke the cram down powers contained in Section 1129(b) have been met to confirm the Plan over the objections of the Sweetwater Production Credit Association, an impaired-dissenting class. Accordingly, Neff's Plan of Reorganization is entitled to confirmation.

Of course, confirmation of a Plan of Reorganization in any farmer bankruptcy is essentially a calculated risk. Any prediction of success must be qualified by caveats as to weather, climate conditions and "just plain bad luck". In the event of a substantial default in the performance of this Plan, the creditors may apply to this Court to have the Plan declared in default, in which event the non-exempt assets of the Debtor remaining in his possession would revert back to the control of this Court. This would be followed by the orderly liquidation of the Debtor's property for the satisfaction of all creditors' claims. Neff, however, by his evidentiary showing at the confirmation hearing has won the right to prove to the Court and his credi-

---

**4.** Although the SBA filed a rejection of the Modified Plan, the Court finds that the second rejection cannot be used to "bootstrap" the failure of the SBA to file a timely rejection prior to the first confirmation hearing. The Modified Plan was filed pursuant to Rule 3019 of the Bankruptcy Rules and there was no change in the treatment of the SBA claim in the Modified Plan.

tors that his Plan can be carried out according to its terms.