**In re VOLUNTARY PURCHASING GROUPS, INC., Debtor.**

**Bankruptcy No. 96–31549.**

United States Bankruptcy Court,
E.D. Texas,
Paris Division.

June 29, 1998.

James Patrick Kelly, Ireland, Carroll & Kelly, Tyler, TX, for debtor.

David W. Elrod, Calhoun & Stacy, P.L.L.C., Dallas, TX, for Southern Pacific Transportation Company and St. Louis Southwestern Railway Company.

## OPINION

DONALD R. SHARP, Bankruptcy Judge.

NOW before the Court for consideration is the Confirmation of the First Amended Plan of Reorganization as Modified through the Fifth Modification filed by Voluntary Purchasing Groups, Inc. ("VPG"). The Court previously approved the Disclosure Statement and has thoroughly reviewed the Disclosure Statement, the Plan, the Modifications to Debtor's Plan, all filed objections, responses thereto and statements or comments regarding confirmation; the Court has considered all evidence admitted at the confirmation hearing, as well as argument of counsel, both written and oral and finds that the First Amended Plan of Reorganization as Modified through the Fifth Modification (hereinafter referred to as the "Plan"), should be confirmed. This opinion constitutes the Court's findings of fact and conclusions of law to the extent required by Fed. R.Bankr.Proc. 7052 and disposes of all issues before the Court.

## FACTUAL AND PROCEDURAL BACKGROUND

VPG is a large purchasing cooperative which deals in agricultural chemicals including fertilizers, pesticides and herbicides. It had been in existence for approximately 30 years at the time of filing for relief under Chapter 11 of the Bankruptcy Code on June 10, 1996. VPG operated and still operates nationwide through a network of small locally owned merchants. It is a marketing system developed over the years to allow local merchants to better compete by merging their buying power through the cooperative. In terms of the size of its operation, VPG has a relatively small amount of fixed assets and the only tangible assets of significant value consist of the inventory stored in various warehouses around the country. The primary value to VPG is now and always has been its network of loyal dealers across the country.

The immediate precipitating cause for the bankruptcy filing for VPG was the tremendous cost of defending lawsuits brought against VPG and other parties growing out of environmental claims. There were numerous class action lawsuits for personal injuries from exposure to toxic substances as well as actions by governmental regulatory agencies dealing with toxic pollution. The toxic pollution is all centered around VPG's former site in Commerce, Texas. This property was acquired by VPG through a series of mergers and transfers and according to the lawsuits pending against VPG and its co-defendants, the property has been contaminated with arsenic. The allegations are that the arsenic has spread to several contiguous commercial properties and intermittent stream known as Sayle Creek and several nearby residential properties. Both the state of Texas and the Federal Environmental Protection Agency have issued administrative cleanup orders in connection with this property. In fact, extensive remediation work has already been done on the property. In 1996 the cost of defending all of these suits became so overwhelming that VPG was forced to seek protection in this Court.

Immediately after the filing of the bankruptcy petition it became apparent that litigation over the confirmation of a plan, or simply staying in bankruptcy court, would be long and acrimonious. There were many contested hearings and a tremendous amount of work drafting and redrafting a plan of reorganization in response to many objections. Over more than a year of litigating and negotiating the plan of reorganization went through several forms but ultimately all of the major objections were resolved without litigation except for the objection of

Southern Pacific Transportation company and St. Louis Southwestern Railway Company (collectively the "The Railroads"). There were other minor unresolved objections but the parties did not appear and take an active part in the confirmation hearing. The confirmation hearing took several days and elicited quite a bit of testimony but The Railroads were the sole objecting party to the confirmation of Debtor's Plan of Reorganization. The Railroads interest arises from their involvement regarding the contamination in Commerce. At the time of the filing of the bankruptcy proceeding, VPG was a defendant and counter-plaintiff in a suit styled and numbered *Southern Pacific Transportation Company, and St. Louis Southwestern Railway Company v. Voluntary Purchasing Groups, Inc., et al., Civil Action NO. 3–94–CV2477–H*, pending before the United States District Court for Northern District of Texas, Dallas Division (the "CERCLA Suit"). In the "CERCLA Suit" the Railroads are seeking from VPG and others, inter alia, "clean up and response costs in excess of Southern Pacific's and S.S.W.'s equitable shares as a result of releases or threatened releases of hazardous substances.." at the designated sites. VPG filed counterclaims seeking similar relief against the Railroads and other parties.

## DISCUSSION OF LAW

Pursuant to § 1129(a) of the Bankruptcy Code, this Court shall confirm a plan only if all of the requirements are met. At the conclusion of the confirmation hearing, the Court identified only four areas that were still troubling and that needed to be answered in order to determine whether to confirm the Plan under § 1129. The four areas related to confirmation are: (1) the Debtor's burden of proof under the best interest of creditors test; (2) the valuation of inventory for liquidation purposes; (3) the application of a discount factor to the liqui-

dation analysis prepared by Price Waterhouse; and (4) policy considerations. As a result, the focus of the opinion will pertain to the four areas that prevented a ruling at the time of the confirmation hearing.

## I. BEST INTEREST OF CREDITORS TEST

To be confirmable, a plan of reorganization must satisfy the "best interests" test under Bankruptcy Code section 1129(a)(7).[1] *See, e.g., In re Neff,* 60 B.R. 448, 452 (Bankr.N.D.Tex.1985), *aff'd,* 785 F.2d 1033 (5th Cir.1986). Section 1129(a)(7) is one of the cornerstones of Chapter 11 practice. It is an *individual guaranty to each creditor* or interest holder that it will receive at least as much in reorganization as it would in liquidation. 7 Collier on Bankruptcy ¶ 1129.03[7] (Lawrence P. King ed., 15th ed.1997). To meet the best interests test, section 1129(a)(7) requires the plan proponent demonstrate that each holder of a claim in a class either accept the plan or receive property under the plan of a value, as of the effective date of the plan, which is not less than such holder would receive in a chapter 7 liquidation on the effective date of the plan. 11 U.S.C. § 1129(a)(7); *In re Briscoe Enters., Ltd. II,* 994 F.2d 1160, 1167 (5th Cir.1993), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993) (" § 1129(a)(7) requires that each holder of a claim in a class either accept the plan or receive at least as much as it would receive in a chapter 7 liquidation."); *In re MCorp Fin., Inc.,* 137 B.R. 219, 228 (Bankr.S.D.Tex.1992); *see also In re Texas Extrusion Corp.,* 844 F.2d 1142, 1159 n. 23 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988) (indicating that when impaired unsecured creditors vote against the plan, the bankruptcy court is required to determine whether those creditors would receive no less under the plan than through liquidation of debtor's assets). In the bankruptcy context, the interest of

1. Section 1129(a)(7) of the Bankruptcy Code provides as follows:

With respect to each impaired class of claims or interests—
  (A) each holder of a claim or interest of such class—
    (i) has accepted the plan; or

    (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date. . . .

creditors, not of the debtor, are paramount. *Texas Extrusion,* 844 F.2d at 1159. The command of section 1129(a)(7)(A)(ii) is the strongest protection creditors have in Chapter 11. *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 297 (Bankr.S.D.N.Y.1990).

■ Unlike the tests under section 1129(b), which protects a dissenting class, the "best interests" test is designed to protect the interests of the dissenting members of a class. The test renders class votes irrelevant if but one dissenting member of that impaired class would get less than its liquidation distribution under the plan. 7 Collier on Bankruptcy ¶ 1129.03[7][a].

■ The plan proponent bears the burden of proof to establish by a preponderance of the evidence that its plan meets the best interests of creditors test. *Briscoe,* 994 F.2d at 1165; *In re Westwood Plaza Apartments, Ltd.,* 192 B.R. 693, 695 (E.D.Tex.1996). "Preponderance" means that it is more likely than not. *Briscoe,* 994 F.2d at 1164. The plan proponent must introduce sufficient current financial information about the debtor, its assets and liabilities, and its prospects to permit the court to determine whether the test has been satisfied. *Neff,* 60 B.R. at 452. A plan may not be confirmed if the evidence is insufficient on which the bankruptcy court can base an independent factual determination that the plan is in the best interests of the creditors. *MCorp,* 137 B.R. at 228. A judgment regarding whether the best interests test has been met is to be made on the basis of evidence, not assumptions. *Crowthers,* 120 B.R. at 297; *see MCorp,* 137 B.R. at 228.

## A. Value of Inventory

The testimony presented by the Debtor and the Railroads demonstrated the significant disparity between the parties on the value of the inventory. It would be an understatement to observe that the evidence presented to the Court at the confirmation hearing regarding the liquidation value of the Debtor's inventory was conflicting. The Debtor offered the testimony of agri-chemicals broker Thomas Powers who opined that, due to several substantial hindrances, the Estate would recognize a recovery of 10–15%

from the sale of the inventory and the midpoint of that range (13%) was incorporated into the liquidation analysis of the Debtor as presented through C.J. Lorio and Walter Bratic. The Railroads countered with the testimony of Coopers and Lybrand accountant Greg Morris who opined that the liquidation of the inventory would achieve a 60% recovery and that of Arthur Andersen accountant Richard Holmes who testified that the recovery would be 50% or more.

Mr. Powers is a surplus agricultural chemical broker. He has been in the agricultural chemical business in some capacity since 1959. (*June Tr. Vol II at 280:8–10* ). He is generally familiar with the type of inventory VPG possesses as a result of his activities in his private agri-chemical brokerage business which he has conducted since 1974 and in which he buys and sells surplus inventories all over the United States. (*June Tr. Vol Ii at 279:6–8* ). As acknowledged by Mr. Powers upon examination by the Court, he is "in the business of buying, selling surplus inventories all the time", (*June Tr. Vol II at 311:13–16* ) and, based upon such knowledge and experience, Mr. Powers noted the existence of substantial obstacles which would undoubtedly have a dramatic effect upon the amount of proceeds to be realized from the liquidation of the VPG inventory and which led him to conclude that a recovery in the 10–15% range would be likely.

Mr. Powers noted the size of the current inventory and the logistical problems arising from the fact that the inventory is located in over 100 locations throughout 11 states. (*June Tr. Vol II at 281.1–4* ). In addition to the considerable expense of transporting the inventory to a central location(s) for sale, Mr. Powers stated that anyone wanting to purchase the inventory would want to inspect it prior to the submission of a bid and therefore would have to incur the expense of traveling to the 100+ locations in order to inspect it lot by lot. Such a detailed inspection would be necessary in this particular industry because a buyer would not know the condition of the product containers and problems caused by forklift damage. Mr. Powers also testified that rust in these warehoused goods could not only subject a buyer to loss due to

damaged or unsalable goods, but to serious cross-contamination problems and would be required to comply with various laws regulating the disposal of used product containers. (*June Tr. Vol ii at 282:3–17; 285:21–25; 286:1–8, 19–24; 291.1–13*). In fact, those issues would not be just a possibility, but a probability according to Mr. Powers and would be seriously considered by any serious bidder on this inventory. As Mr. Powers stated, "whoever inherits this inventory through purchase or liquidation bankruptcy is going to be faced with the problems of disposing of a certain amount of damaged containers", (*June Tr. Vol II at 308:15–18*), and that a "thorough inspection of the inventory" would have to be conducted in order for the prospective buyer to actually determine what you could sell and not sell. (June Tr. Vol II at 309:18–22).

Mr. Powers further observed that, as to VPG's branded lawn and garden products, no competitor of VPG would desire to purchase these branded products since each competitor has "their own established brand names that they're very proud of." (*June Tr. Vol II at 311:2–3*). Neither is any independent dealer likely to purchase from a liquidating trustee the VPG-branded lawn and garden inventory, particularly an inventory of this size, since there would no longer be a viable company backing up these branded products or providing liability insurance protection against the assertion of product claims by consumers. (*June Tr. Vol II at 284:2–9*). Mr. Powers testified that he had personally "tried in years past to sell this type of inventory that bankruptcy lawn and garden inventory from a bankruptcy company, and it's just next to impossible to even give it away." (June Tr. Vol II at 284:10–12).

As for the sale of VPG's farm chemical inventory by a liquidating trustee, Mr. Powers opined that there were only three or four companies in the United States who would be capable of bidding upon such a large amount of surplus inventory and that, in his opinion, those large volume dealers would not be interested in such a mass purchase of surplus inventory in the basic manufacturer's original cartons and containers because to do so would disrupt the normal business relation-

ship between those large-volume dealers and the basic manufacturers. Mr. Powers noted that the volume dealers obtain certain discounts from the manufacturers for volume purchases and that, if the volume dealer meets the established purchase quota or goals for a particular year, then the dealer is entitled to a year-end rebate. (*June Tr. Vol II at 284:13–19*). Accordingly, the large-volume dealers "would be very reluctant to buy any quantity of the same brand product that they're buying from the basic manufacturer from a broker or from a bankrupt company, because that would interfere with their quotas that they need to make with DuPont or Dow or any of the basic manufacturers, and interfere with their relationships.... that's what I've found over 23 years of business." (June Tr. Vol II at 284:19–25; 285:1–2).

Based primarily upon his experience in the surplus agri-chemical business, Mr. Powers concluded that:

> "it would be next to impossible to find any one entity to place a bid on the inventory as-is, where-is at any price." They [the potential buyers] don't want the headaches, etc.... The only way the inventory could be sold would *be over* a period of six months to a year with some party selling it off a little here and a little there to the various independent dealers (June Tr. Vol II at 304:11–18).

Accordingly, it was Mr. Powers' conclusion that the liquidation of the VPG inventory over a short period of time would result in a recovery of from 10 to 15%. (June Tr. Vol II at 287:16–18).

The Railroads dispute the value the Debtor placed on the inventory in liquidation. They assert that such value is inappropriate considering the evidence introduced. Mr. Holmes, the Railroads expert, testified that this case is very exciting from a liquidation type basis because the Debtor has built-in patrons. He testified that the Debtor could simply dispose of the inventory by selling it to the patron and pay them more than what they are getting now as a patron dividend. Mr. Holmes argues that such a procedure would result in a liquidation of the inventory at close to 100 cents on the dollar of cost.

He further testified that even if he was wrong by 50 percent, the inventory would still bring in 50 cents on the dollar.

Additionally, the Railroads claim that selling the inventory in liquidation to the patrons is clearly the best solution and is consistent with the testimony of Jefferson Garrison, owner of one of the Debtor's lawn and garden patrons. Mr. Garrison testified that in the past he has taken advantage of discounts offered by the Debtor by buying out of season products in bulk "for every year that he's been in business. " He further testified that a good number of other patrons have done the same. Based on such evidence, the Railroads claim that the Debtor's inventory liquidation value of thirteen percent of cost is inappropriate.

Finally, Railroads maintain that the evidence amply indicated that Price Waterhouse used an inappropriate value for inventory in Exhibit 10, thereby detrimentally affecting its best interest of creditors analysis. Based on such flawed analysis, the Railroads contend that Debtor failed to tender credible evidence that its Plan meets the best interest of creditors test and therefore, this Court cannot confirm the Debtor's Plan.

The Debtor asserts that based upon the record and specifically, the knowledge of each expert witness regarding this industry and the other factual bases undergirding the opinion of each expert witness as to the liquidation of the inventory, the Court should conclude that the testimony of Mr. Powers is substantially more dependable and credible than that offered by Mr. Morris or by Mr. Holmes and such testimony provides ample and reliable support for the anticipated liquidation proceeds arising from the sale of inventory as utilized in the liquidation analysis.

**B. Discount Factor**

Another area of importance in determining whether the best interest is met, is whether the discount factor applied by the Debtor is proper and accurate. The Debtor applied a nine percent annual discount rate to distributions proposed under the Plan. Mr. Bratic stated the rate accounted for ordinary business risks and assumed continued support from the Debtor's patrons.

In comparison, the Debtor explained that a liquidation analysis which must encompass and evaluate thousands of unliquidated and contingent claims in a highly divisive and contentious legal atmosphere in which the Debtor is only one of several co-defendants in ongoing tort litigation is not as simple. In selecting a discount rate, the Debtor stated that the time value of money and other risks and opportunity costs associated with waiting to be paid over a specified period of time should be taken into account. Finally, the Debtor stated in their supplemental brief that the use of a discount factor to calculate the present value of projected distributions in a hypothetical chapter 7 liquidation is supported by case law. *See, e.g., In re MCorp Financial Inc.,* 160 B.R. 941, 952 (S.D.Tex. 1993) ("[T]he tests for actions under the code are based on an evaluation of the assets as of the effective date of the plan."); *In re Sierra–Cal,* 210 B.R. 168, 172 (Bankr.E.D.Cal. 1997) (court applied 12% discount factor to calculate the present value of the liquidation value of assets.)

In support of applying a discount rate, the Debtor discussed in its supplemental brief two factors which must be considered in calculating the net present value of a proposed future payment: (1) the length of time until payment, and (2) the risk-adjusted interest rate. *In re MCorp Financial Inc.,* 160 B.R. at 952.

The first factor to be determined in calculating the present value of the hypothetical liquidation proceeds of VPG is the selection of the probable payment date. In this case, the Debtor believes the actual distribution date is highly uncertain due to the pendency of over seventeen (17) lawsuits which involve claims and counterclaims asserted by more than 2,500 claimants and co-defendants. At the confirmation hearing, Leonard Pipkin testified on behalf of the Debtor that it was likely that a distribution in liquidation would not likely occur for five years. Thus, for purposes of the liquidation analysis, Price Waterhouse assumed a distribution date or payment date of five years after conversion of the case.

The second key factor to be considered in calculating the net present value of projected distributions in liquidation is the discount rate. Debtor contends that the ultimate recovery on liquidation of VPG's inventory is difficult to estimate because there are a number of factors that would affect the actual recoveries. The factors Debtor considered include the following: (1) the inventory consists of unique products subject to numerous federal and state regulations; (2) there are seasonality concerns; (3) the amount of inventory available would be unprecedented in this particular market; (4) the inventory is scattered among 120 different locations; (5) the financial wherewithal of potential buyers to buy large amounts of inventory and pay transportation and storage costs is unknown; and (6) there are other industry-specific factors, such as successor liability.

Finally, in completing the liquidation analysis, Mr. Lorio made the following assumptions: it would be five (5) years before any distribution would be made to creditors; chapter 11 expenses of $3.5 million and a three percent (3%) trustee fee of about $3 million would be incurred; and about $1 million would be spent to wind down the business. Furthermore, Mr. Lorio testified that in order to account for the impact of the these risk factors on the present value of the projected proceeds in a liquidation he applied a discount rate of thirty percent (30%) to determine the present value of that future payment. Debtor contends that using a 30% discount rate in computing the liquidation analysis is conservative and that it could arguably be much higher considering the significant risk to the estate of protracted, multi-party litigation and environmental expenditures.

The Debtor admits the liquidation analysis is different than liquidation scenarios often seen in bankruptcy case, and those previously calculated in this case. The difference is the use of a discount rate to take into account the fact that in a chapter 7 liquidation, none of the creditors would receive an immediate distribution, and instead would have to wait until all claims of every type were settled or litigated. Furthermore, Debtor contends that by applying a discount factor to account

for the probable length of time and the risks associated with creditors actually receiving any distribution in a chapter 7 liquidation, more accurately projects the likely return to creditors.

On the other hand, the Railroads argue that Debtor failed to explain why such a steep discount rate should be repeatedly applied in every ensuing year, when administrative costs are low, even by the Debtor's own estimates, and there are no other real risks confronting the estate in the nature of potential losses from litigation.

In addition, the Railroads claim the use of a discount rate in a liquidation analysis is an oddity. They do not disagree that discount factors are regularly used in the financial world, however, they object to such use in bankruptcy proceedings. The Railroads expert, Mr. Holmes, disagreed with the 30% rate used because there was not enough risk to justify such a rate. The Railroads also argue that Debtor's reliance on *In re Resorts International, Inc.*, 145 B.R. 412 (Bankr. D.N.J.1990), is improper because it does not mention the use of a thirty percent discount rate or the need to apply an additional discount factor to account for the "risks" of recovery in liquidation. Finally, the Railroads contend that applying such a rate is merely Debtor's attempt to make the numbers work and that had Debtor not used a discount factor in its liquidation analysis, it clearly could not have met the best interest of creditors test.

## C. Summary of Best Interest of Creditors Test

In order for this Court to rule whether the Debtor has met the "best interests test" as gleaned from § 1129(a)(7) of the Bankruptcy Code, two critical issues must be resolved. The two areas as discussed previously are: (1) the valuation of inventory in liquidation; and (2) the Debtor's utilization of a 30% discount factor in the liquidation analysis.

The Railroads contend that despite all the testimony presented by VPG they failed to satisfy the best interest of creditors test. First, the Railroads claim that the Debtor's expert, Mr. Bratic, used the wrong standard. With regard to creditors in classes 7 and 9

under the Plan, Mr. Bratic assumed a ten million dollar figure—the amount of money the Plan provides for the Debtor to pay into the trust established under the Disbursing Agency Agreement (the "Agreement"), for the numerator in his best interest analysis. The problem with such analysis is that Mr. Bratic failed to determine what amount might ultimately be available for distribution to the creditors. Failure to determine the amount of dissenting creditor recoveries contravenes the requirement of section 1129(a)(7) and the underlying policy to protect individual creditors.

■ Furthermore, the Railroads argue that while Mr. Bratic found no difficulty in not factoring in costs and fees associated with the Agreement under the Plan, he easily was able to add costs and risks in the liquidation scenario. In determining whether the Debtor met the best interest of creditors test and ultimately whether the Plan should be confirmed, the Court must consider the unique nature of the Debtor. The Debtor is a purchasing cooperative as opposed to a corporation. This being the case, the business operations and the motives of the Debtor are different. As a result, the Court finds that Debtor's unique status as a co-op requires a slightly different liquidation analysis than that typically used in considering an ordinary chapter 11 plan of reorganization.

The court in *Sierra–Cal* stated that:

[i]n computing the hypothetical chapter 7 liquidation, the court is entitled to view the entire record of the case and to engage in rational speculation about what would occur in a chapter 7 liquidation. Among other things, the court can hypothesize that certain claims would evoke the objection of a chapter 7 trustee and can speculate about the likely fate of such objections, bearing in mind the protective purpose of the "best interest" test.

For almost thirty years, this cooperative has existed in order to allow its patrons, most of whom are small, locally owned merchants, to compete in the marketplace with larger competitors by merging their buying power through the cooperative to purchase agricultural chemicals and lawn and garden fertilizers and chemicals. As a result, the

Court finds that the strength of the Debtor is directly attributable to the patrons participation.

As to the issue of inventory valuation, the fact that the Debtor is a cooperative greatly effects this Court's analysis. First, the Court finds the Railroads proposal to sell the inventory at liquidation to the patrons themselves will not be in the best interest · of creditors. While some of the patrons may be willing to buy some of the inventory at liquidation, this clearly will not yield a greater return to the creditors, in particular the Railroads. The patrons are relatively small in size and the evidence only indicates slight participation. Therefore, the evidence favors the Debtor's estimate of the value of inventory during a liquidation and exposes the flaws in the Railroads inventory analysis. There is no doubt that if the Debtor continues its operations the inventory will bring in a greater value due to full participation by the patrons.

As to the issue of whether Debtor was correct in applying a 30% discount factor in the liquidation analysis, the Court does not totally agree but certainly does not disagree with using such a rate.

After carefully reviewing the cases cited by the Debtor, the Court is not convinced one way or the other whether Debtor should be allowed to apply a 30% discount rate in its liquidation analysis. The only court that specifically mentioned a discount rate was *Sierra–Cal*, in which the court applied a 12% discount factor to calculate the present value of two notes that were property of the estate. The court in *MCorp* also used a discount rate in comparing the net present value of benefits between a settlement as opposed to litigation. The problem is that neither of these cases apply any kind of discount factor to projected distributions in a hypothetical liquidation nor provide support for such application.

However, in *Resorts, International,* the Debtor in its liquidation analysis assumed a liquidation within six month and thus discounted a gross liquidation value of $310 million to a present value of $300 million. While the term "discount factor" was not

specifically mentioned, it is obvious that some sort of discount factor was used.

Despite this Court's doubts that a 30% discount rate in its liquidation analysis is correct, the Debtor overwhelmingly convinced the Court that any holder of an impaired claim, in particular the Railroads, would receive under the plan property of a value, as of the Effective Date, that is not less than the amount such holder would receive under a chapter 7 liquidation. The evidence presented conclusively established that if the Debtor were forced into liquidation it would simply recover less for its inventory. The patrons would clearly be unable to purchase all of the inventory, which leaves the Debtor in a difficult situation because its existence is directly connected to patron activity. Upon liquidation, the entire patron network would begin to dissolve. There would be no hope of a continuing marketing operation whose patrons would enjoy the enhanced buying power of being in a large group.

The Court is convinced that a Chapter 7 Trustee would have an extremely difficult time liquidating this inventory. The Court gives great credence to the testimony of Tom Powers and of Leonard Pipkin in this regard. Mr. Powers was the most knowledgeable and experienced dealer in the liquidation of the type of products with which we are faced in this case. It is clear from Mr. Powers testimony that the risks and hazards in trying to liquidate a large amount of this type inventory are tremendous. It was also clear that the true value in this inventory can only be realized by maintaining the orderly disposition of the inventory through the well established patron network that VPG has developed over the past 30 years. A sudden and precipitous liquidation of all of the inventory would create nothing but chaos in the market for this type of product. Mr. Leonard Pipkin testified as one who has wide experience operating in the Chapter 7 arena. Mr. Pipkin has functioned as a Chapter 7 Trustee and as a special liquidating trustee under various Chapter 11 plans. As such, he is extremely familiar with the burdens placed on a trustee, the attendant expenses involved and the time involved in gathering and marketing inventory. When coupled with the additional problems noted by Mr. Powers which are occasioned by the hazardous nature of many of the products involved in this case, it seems clear that a forced liquidation is the worst possible scenario for everyone involved. It must be noted that we are dealing with a situation where the Debtor has a strong and committed management in place which is dedicated to a continuation of their business. With this commitment, it seems clear to this Court that the maximum recovery of the value of the inventory can only be expected through a continuation of an orderly marketing plan through the long established patron network. Based on the evidence presented, the Court is convinced that there will be a larger fund of money available to creditors to satisfy their claims under a confirmed Plan than there will be under a chapter 7 liquidation. More specifically, the Court finds that the Railroads will receive at least as much under the Plan in present value terms as it would if the property were sold today. *See Briscoe*, 994 F.2d at 1167.

## II. POLICY CONSIDERATIONS

The fourth and last area of concern regarding plan confirmation, is the policy issue regarding the weight to be given to the fact that the Plan is supported by every major creditor constituency and opposed only by the Railroads. There is truly only one disputed claimant, the Railroads, seeking to block the confirmation and implementation of this plan of reorganization which this Court finds will allow the Debtor to maintain its financial viability as a functioning cooperative while protecting the best interest of creditors. The Railroads have engaged in an all-out assault throughout the entire case in order to prevent the Debtor from continuing its operations.

It has been apparent for some time in this case that the railroads wanted to block this reorganization because of their objection to virtually every step that the Debtor took in furtherance of the reorganization process. While one might speculate on the railroads motives given the extensive litigation in which the railroads and VPG, with other

defendants, in other courts, the fact remains that the Debtor bears the burden of demonstrating that the plan of reorganization meets the best interest of creditors tests. This Court certainly implies no wrong doing or ill will on the part of the railroads. They have ably and competently pursued the defeat of this reorganization plan throughout this case. However, the resources they have thrown into an effort to defeat the reorganization process has been far disproportionate to the small difference in total recovery they could expect in their scenario of liquidation versus reorganization. It is obvious that the Railroads are convinced that their best long-term interest lies in defeating this reorganization but this Court is convinced that it is not because of their hope to recover more money on liquidation. The evidence is simply overwhelming that the risk enumerated by Mr. Powers and the expenses enumerated by Mr. Pipkin make a proposed liquidation far more risky than continued operation under the plan of reorganization. Therefore, the Railroads' objections must fail. In spite of their vigorous and able opposition, their hope of recovery in this bankruptcy is greater upon reorganization, as it is with all other creditors, than upon liquidation. They may very well be right that their long-term interest in all of the other ongoing litigation would be best served by denying VPG the right to reorganize. However, this Court must consider the bankruptcy litigation only and leave the relationship between the Railroads, VPG and all of the other defendants in all of the other litigation to those courts which have jurisdiction over those matters.

## CONCLUSION

The Court holds that the Debtor has established by a preponderance of the evidence, that the Railroads's objections to confirmation should be overruled and that the Debtor's Plan should be confirmed. Such a result is required in order to meet the best interest of creditors. It is clear from the evidence presented and the unique nature of the Debtor that allowing the Debtor to operate under the Plan presented will allow the Debtor to achieve the greatest financial result and in turn allowing the highest possible return to creditors. The Patrons are what make this company and to destroy such an infrastructure by denying confirmation in favor of liquidation will only cause more harm to creditors.