**In re MORTGAGE INVESTMENT COMPANY OF EL PASO, TEXAS and Elpor, Inc., Debtors.**

**Bankruptcy Nos. 89–30310, 89–30296.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

Feb. 14, 1990.

---

Harrel L. Davis, III, Grambling & Mounce, El Paso, Tex., for debtor, Mortg. Inv. Co. of El Paso, Tex.

John P. Melko, Craig J. Litherland and Mitchell A. Seider, Sheinfeld, Maley & Kay, Houston, Tex., for debtor, Elpor, Inc.

Asher Rabinowitz, Stephen Wasinger and John G. Colucci, Honigman, Miller, Schwartz, and Cohn, Houston, Tex., for Heights of Tex., FSB.

Gerald P. Keith, Ginnings, Birkelbach, Keith & Delgado, El Paso, Tex., for Official Committee of Unsecured Creditors.

## OPINION

RONALD B. KING, Bankruptcy Judge.

This opinion considers the applicability of the "capital infusion exception" as enunciated in *Case v. Los Angeles Lumber Prod. Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939) and further discussed in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). At issue is whether the controlling shareholder, Ronald A. Piperi, may infuse $600,-000.00 cash capital into the consolidated Debtors in order to receive the equity ownership through a plan of reorganization.

The Debtors' major impaired creditor, Heights of Texas, FSB ("Heights"), has vociferously objected to confirmation of the Debtors' Second Amended Consolidated Plan of Reorganization (the "Plan"). Heights poses seven objections to the Plan, of which three are meritorious. Confirmation of the Plan must, therefore, be denied.

## I.

## FACTS

### A. Background.

The facts in this case are complicated and not all relevant to the issues at hand. As such, only those facts necessary to the disposition of this case will be stated.

Ronald A. Piperi owned approximately 76 percent of First Savings Association of Orange, Texas ("First Savings") in 1983. In 1984, First Savings looked to expand its business into mortgage origination and servicing, and became interested in acquiring Mortgage Investment Company of El Paso, Texas ("MICO"). MICO is a mortgage origination, servicing and real estate company which has been in business in El Paso since 1917. Upon identifying MICO as a viable entity for acquisition and investment, First Savings undertook measures to acquire MICO. Upon the advice of tax counsel, First Savings concluded that for tax purposes, it would be prudent to purchase MICO through the formation of a new corporation which would be owned by the existing shareholders of First Savings in the same proportion as their ownership in First Savings, rather than as a subsidiary of First Savings. Consequently, Elpor was formed in 1984 as a holding company to acquire the stock of MICO. Elpor borrowed the purchase price of approximately $73.2 million from First Savings, collateralizing its obligation with the stock of MICO. Additional advances were later made by First Savings or its successor to both Elpor and MICO.

In compliance with regulatory standards, First Savings made application to the Federal Home Loan Bank, Dallas ("FHLB") for approval of the proposed transaction. The FHLB responded to the proposal by challenging the Elpor transaction as a violation of FHLB regulations. The FHLB premised its challenge on the basis of prohibited loans to insiders of First Savings. To date, the FHLB has not approved the Elpor transaction.

During the interim, First Savings changed its name to Champion Savings Association ("Champion") and moved its office and operations to Houston, Texas. Thereafter, MICO began transferring personnel and loan servicing to a newly acquired mortgage servicing subsidiary of Champion, Gulf Coast Investment Corporation ("Gulf Coast"). Additionally, Ronald A. Piperi, former Vice–Chairman of First Savings, removed himself from First Savings in an attempt to appease the FHLB. This effort apparently did not mollify the FHLB, and subsequently, the new management of First Savings brought suit against Ronald A. Piperi and Elpor for alleged misconduct with respect to the Elpor indebtedness.[1]

After the filing of that lawsuit, the FHLB declared Champion insolvent on September 23, 1988, and appointed the Federal Savings and Loan Insurance Corporation (the "FSLIC"), as receiver. Thereafter, the FSLIC sold the assets of five failed savings and loan associations, including Champion, to Heights and its parent company, First Heights Savings, FSA.[2] Heights resumed negotiations with Elpor with respect to merging MICO into Heights, the successor in interest to Champion, and Gulf Coast, Heights' subsidiary. Apparently, on the

---

**1.** Heights has endeavored to utilize the conduct of Mr. Piperi and his subsequent investigation by the FSLIC to prevent confirmation. This subject, while hotly contested, is not dispositive as to any confirmation issues. It is relevant only to good faith and the identity of postconfirmation management under 11 U.S.C. § 1129(a)(3) & (5) (1982 & Supp. V 1987). Title 11 is referred to herein as the Bankruptcy Code or the "Code."

**2.** First Heights is owned by Pulte Diversified Consolidated, Inc. ("PDCI"), which owns no property other than the stock of First Heights. PDCI is a subsidiary or affiliate of PHM Corporation.

eve of reaching a settlement, the FSLIC intervened to prohibit Heights from closing the transaction. Thereafter, Heights demanded immediate payment of the Elpor note, which had been renewed and extended several times beyond its original maturity. Elpor subsequently sought, in state district court, to enjoin foreclosure on the MICO stock. Upon denial of a temporary injunction in state court, Elpor sought relief under Chapter 11 of the Bankruptcy Code on April 27, 1989. MICO followed with its Chapter 11 filing on May 2, 1989.

### B. Summary of Bankruptcy Events.

On May 1, 1989, in the Elpor case, Heights filed its Motion to Dismiss the Chapter 11 case, Motion for Relief from Stay and Motion for Appointment of a Custodian, requesting hearings on an expedited basis. On May 12, 1989, a hearing was conducted on Heights' motions, at which Heights' Motion for Relief from Stay and Motion to Dismiss were denied, and Heights' custodian motion was withdrawn. Heights' claims consist of a $120,000,000.00 secured claim against Elpor, secured by the stock of MICO, and a $135,000,000.00 unsecured claim against MICO. Elpor owns all of the shares of MICO, and the total value of MICO's assets is approximately $108,-000,000.00. As such, MICO is rendered insolvent by the unsecured claim of Heights, and Elpor's principal asset is the insolvent MICO.[3]

On May 22, 1989, the Court granted, over Heights' objections, the motions of Elpor and MICO for joint administration of their cases. There have been numerous skirmishes between the parties in adversary proceedings involving injunctive relief; discovery disputes; composition of the Creditors' Committee; retention and payment of professionals; and various other contested matters. Motions were filed by the respective parties to shorten and extend the exclusivity periods of section 1121. Both motions were denied, and the Debtors' Consol-

idated Plan of Reorganization was filed on August 25, 1989. A confirmation hearing on the Plan, as amended, was conducted on October 25, 1989 through October 27, 1989.

## II.

### SUMMARY OF HEIGHTS' OBJECTIONS

Heights advances seven principal objections to the confirmation of the Plan. These objections may be summarized as follows:

1. The Plan provides for an illegal substantive consolidation of the estates of Elpor and MICO;

2. The Plan is not feasible under section 1129(a)(11);

3. The Plan has not been proposed in good faith under section 1129(a)(3);

4. The appointment of Ronald A. Piperi as Chairman of the Board of New MICO is not consistent with the interests of creditors under section 1129(a)(5);

5. The Plan unfairly discriminates against Heights under section 1129(b)(1);

6. The Plan fails to satisfy the "best interests of creditors" test under section 1129(a)(7); and

7. The Plan violates the absolute priority rule under section 1129(b).

Although sustaining only one of the objections requires denial of confirmation, all seven objections will be discussed in order to afford the parties complete findings of fact and conclusions of law pursuant to Bankr.R. 7052.

## III.

### SUMMARY OF PLAN OF REORGANIZATION

The Plan provides for the substantive consolidation of Elpor, Inc. and MICO into a new MICO, Inc. Substantive consolida-

---

**3.** On the day the Elpor Chapter 11 case was filed, MICO assigned to Elpor purported lender liability causes of action against Heights. Elpor also may have an interest in a $100,000.00 cash bond posted in the state court litigation by El-

por, although it appears that the actual source of the money was MICO or one of its subsidiaries. The validity of these transfers has not been determined at this time. There is no evidence that Elpor owns any other assets.

tion will merge the assets and liabilities of Elpor, Inc. and MICO. Accordingly, the claims of the Debtors' respective creditors and the interests of their equity security holders will be asserted against the consolidated entity.

Under the Plan, MICO, Inc. will pay its creditors through three principal means. First, a liquidating trust ("Creditors' Trust") will be established for the benefit of creditors. Approximately $83,000,000.00 of MICO's assets will be used to fund the Creditors' Trust. The Creditors' Trustee (Heights or a Chapter 7 panel trustee) will pay creditors' remaining claims out of the proceeds realized from the liquidation of the Trust's assets. Second, new MICO, Inc. proposes to retain the remainder of approximately $25,000,000.00 of MICO's assets ("Retained Assets"). These assets will secure a promissory note payable to Heights in the amount of the value of the Retained Assets. MICO may only keep the proceeds realized from the sale of Retained Assets if they exceed the stated capital price *and* MICO is not delinquent on the Heights' note principal and interest payments. The Debtors believe that the Retained Assets will generate sufficient revenue to make periodic principal and interest payments on the note based on a twenty year amortization and a twelve year balloon maturity. Third, Ronald A. Piperi proposes to contribute $600,000.00 as an equity infusion on the effective date of the Plan, in return for ownership of all of the shares of the new MICO. This capital infusion has been designated to pay the Class VI unsecured trade creditors in full within thirty (30) days of the effective date of the Plan, and up to $250,000.00 to the Class VII unsecured creditors within forty-five (45) days of the effective date of the Plan.

Elpor and MICO believe that under the Plan, holders of claims will obtain a recovery from the new MICO, Inc. with a value in excess of what otherwise would be available under a Chapter 7 liquidation. The Debtors' financial analysis purports to show that confirmation of the Plan will permit the consolidated entity, MICO, Inc., to continue in business as a viable and profitable going concern, and that the Plan will not likely be followed by a liquidation.

## IV.

### DISCUSSION

A. *Does the Plan provide for illegal and inequitable substantive consolidation?*

Heights maintains that "the sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors." *In re Augie/Restivo Baking Co.,* 860 F.2d 515, 518 (2d Cir.1988). To that end, Heights contends the Plan does not benefit the interest of Heights, the largest creditor of Elpor and MICO. Heights believes that by substantively consolidating the Debtors, Heights would not receive the "indubitable equivalent" of its secured claim. *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir. 1935). Heights construes "indubitable equivalence" to mean control of the debtor now, as opposed to payment under a long-term note later. Heights argues that under *Murel,* a long-term payment by a reorganized debtor cannot be equivalent to the control of assets Heights would receive if Heights were allowed to foreclose on the MICO stock today.

 Heights confuses what is at issue on the merits of substantive consolidation. Substantive consolidation principally considers whether a creditor of one debtor is unfairly joined with and possibly subordinated to creditors of another debtor entity.[4] *Augie/Restivo Baking Co.,* 860 F.2d at 518. This requires a showing of whether the creditors (1) dealt with the debtors as a single economic unit, and (2) whether the affairs of the debtors are so entangled that consolidation would benefit all creditors. As noted, Heights is a creditor of both Debtors and its claim is interrelated to both entities. A situation involving a parent holding company and an operating subsidi-

---

**4.** A topical discussion of the merits of substantive consolidation appears in Sargent, *Bankruptcy Remote Finance Subsidiaries: The Substantive Consolidation Issue,* 44 Bus.Law. 1223 (1989).

ary filing bankruptcy conjunctively suggests an appropriate case for substantive consolidation:

> Substantive consolidation usually results in, *inter alia*, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the two companies for purposes of voting on reorganization plans.

*Augie/Restivo Baking Co.*, 860 F.2d at 518 (citation omitted).

Further, there is no doubt that Heights did not distinguish between Elpor and MICO as distinctly separate entities. This lack of distinction and the creditors' reliance on the assets of both entities have been held to be sufficient grounds for substantive consolidation. *In re Richton Int'l Corp.*, 12 B.R. 555, 558–59 (Bankr.S.D.N.Y. 1981).

■ Additionally, case law has developed several factors which courts should consider in determining whether substantive consolidation is appropriate:

1. The presence or absence of consolidated financial statements;

2. The unity of interests and ownership between the various corporate entities;

3. The existence of parent and intercorporate guaranties on loans;

4. The degree of difficulty in segregating and ascertaining individual assets and liabilities;

5. The transfer of assets without formal observance of corporate formalities;

6. The commingling of assets and business functions; and

7. The profitability of consolidation at a single physical location.

*Richton Int'l Corp.*, 12 B.R. at 558 (citing *In re Vecco Constr. Indus., Inc.*, 4 B.R. 407 (Bankr.E.D.Va.1980)). Most of these elements are present here. There is clearly a unity of ownership, commingling of assets and business functions, and transfers of assets without corporate formalities as between the Debtors.

Finally, the Debtors have adduced evidence that Heights' interests are not adversely affected by substantive consolidation. The Debtors' liquidation analysis sufficiently demonstrates that Heights would receive as much in dollars under the Plan as under a liquidation.[5] Heights will receive a note secured by the Retained Assets; receive most, if not all, of the proceeds of the sale of the Creditors' Trust assets; and be allowed to serve as Trustee of the Creditors' Trust. This mechanism is arguably the "indubitable equivalent" of Heights' claim given the fact that the MICO stock may have no balance sheet value.[6] Accordingly, Heights' objection to substantive consolidation is overruled.

## B. *Is the Plan feasible?*

■ Heights argues that the Plan is not feasible because the Debtors have not proven sufficiently that the proposed Plan will not be followed by liquidation or the need for further financial reorganization.[7] Heights argues that the Plan's projected payouts are speculative, the estimated value of the Debtors' assets are overstated, and that the Debtors will lack both sufficient income and capital to make periodic note payments and satisfy the balloon note in twelve years. These concerns are typical of most creditors of debtor entities

---

**5.** This argument does not factor in the "control" aspect of Heights' argument or the merits of the Debtors' capital infusion proposal.

**6.** Technically, the stock has no balance sheet value, given the extent of Heights' debt against it. Regardless, the MICO stock may have value based upon control of a going concern which owns $108,000,000.00 in assets. *Ahlers*, 108 S.Ct. at 969.

**7.** Section 1129(a)(11) requires that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

*See In re Elm Creek Joint Venture*, 93 B.R. 105, 110 (Bankr.W.D.Tex.1988). This is generally referred to as economic feasibility. *In re 1000 Int'l Bldg. Assoc.*, 81 B.R. 125, 126–27 (Bankr.S. D.Fla.1987).

which propose long-term payouts under Chapter 11.

The Debtors respond that their projections are feasible and valid. As such, the question turns on the reliability of the Debtors' forecast.[8] Without doubt the Debtors in this case went to great lengths to substantiate their proof. Values placed on assets were conservative and assumed a depressed economy. The prospect of successfully selling assets was fully considered against the backdrop of a depressed real estate market. The Debtors provided for modest increases in rental income on real estate properties. Plan payments and capital expenditures were considered in a variety of situations, and attention was given to the Debtors' ability to pay note payments and capital expenditures over the length of the Plan. *In re Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir.1988) (feasibility standard is whether plan offers reasonable assurance of success). Further, there is little argument that MICO has been a respectable and solid company, victimized by a turn of events which has left no one in the Texas real estate market unscathed. The failure of this Plan is not a function of its projected capacity to return the company to economic well-being, but rather the Debtors' failure to accomplish reorganization within other required parameters of section 1129. As such, the Court finds that the Plan is feasible.

C. *Has the Plan been proposed in good faith?*

■ Section 1129(a)(3) requires that "the plan has been proposed in good faith and not by any means forbidden by law." The Fifth Circuit has interpreted this require-

ment to mean a legitimate and honest purpose to reorganize the debtor, coupled with a scheme which has a reasonable probability of success. *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir.1985). Further, good faith may include consideration of the plan proponent's prepetition conduct. *In re Elsinore Shore Assoc.*, 91 B.R. 238, 260 (Bankr.D.N.J.1988).

■ Heights predicates its objection based on lack of good faith on two grounds. First, Heights claims that impairment of Class VI unsecured trade creditors is unnecessary because available funds exist to pay the Class VI unsecured trade creditors. Second, Heights believes that the creation of an impaired class of security deposit claims was in bad faith, and that creating an impaired class of priority tax claims was improper.

■ The Debtors respond that impairment of the Class VI unsecured trade creditors is necessary because there may not be sufficient funds available to pay them without a capital infusion. Further, classification of claims is a prerogative afforded to Chapter 11 debtors. *In re LeBlanc*, 622 F.2d 872, 879 (5th Cir.), *reh'g denied*, 627 F.2d 239 (5th Cir.1980); *see* section IV(E), *infra*. Additionally, there is no proscription against security deposit claims being placed in a separate class under a plan. Finally, although section 1123(a)(1) provides that a plan shall designate classes of claims other than, among others, priority tax claims, there is no prohibition against priority tax claims being placed in a class, so long as that class is not the only impaired accepting class relied upon to reach cramdown under section 1129(a)(10). *See In re Perdido Motel Group*, 101 B.R. 289, 293–94 (Bankr.N.D.Ala.1989). The priority

---

8. The Court's scrutiny of the Plan for purposes of determining whether the feasibility requirement has been met should include an examination of the following factors: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re Future Energy Corp.*, 83 B.R. 470, 503 (Bankr.S.D.Ohio 1988) (citations omitted); *see also In re Nelson*, 84 B.R. 90, 93 (Bankr.W.D. Tex.1988) (there must be sufficient cash flow to fund and operate the plan); *In re Agawam Creative Marketing Assoc.*, 63 B.R. 612, 620 (Bankr. D.Mass.1986) (court should also consider whether debtor will have ability to meet capital expenditures).

tax claimants were not relied upon in this case as an accepting impaired class in order to reach cramdown. The classification was, therefore, not used for any improper purpose.

There is no credible evidence that the Plan was proposed with bad intent or malfeasance, or in contravention of any applicable law. It appears that the Debtors were merely exercising their rights under the Code. *Sun Country,* 764 F.2d at 408. Heights' objection based on lack of good faith is tenuous, and, accordingly, is overruled.

D. *Is the appointment of Ronald A. Piperi inconsistent with the interests of creditors?*

■ Heights argues under section 1129(a)(5)(A)(ii) that the Court is required to review the appointment of individuals proposed to serve as officers of reorganized debtors with respect to whether or not such an appointment is consistent with the interests of creditors. Heights urges that the Court should consider:

> [W]hether such continuing service directly or indirectly perpetuates incompetence or lack of discretion, active misconduct, inexperience, connections or affiliations with repudiated personnel or groups inimical to the best interests of the debtor, or personnel which appears likely to establish new relationships undesirable from the standpoint of the reorganized company or the public at large.

5 Collier on Bankruptcy, para. 1129.02[5][a] (15th ed. 1989) (footnotes omitted).

Heights argues that an alleged governmental investigation relating to Mr. Piperi's savings and loan activities undermines his ability to serve as managing officer of the new corporation. Further, Heights ob-

jects to the ability of Mr. Piperi to have access to $25,000,000.00 worth of assets projected to be available at the conclusion of the payout under the Plan, arguing that the Plan unduly allows him more compensation than that to which he is entitled.[9]

These arguments do not relate to Mr. Piperi's competency to manage new MICO, but rather relate to Heights' disdain for Mr. Piperi's continued involvement in the Debtors. The governmental investigation allegedly being conducted concerning Mr. Piperi has no bearing or relevance on his ability to manage the new MICO entity.[10] Further, the Debtors have correctly noted that all creditors, with the exception of Heights, have voted in favor of the Plan and in favor of Mr. Piperi serving as chairman of the new MICO entity. The Court is not being asked to adjudicate the merits of Mr. Piperi as the chairman, but rather to referee the rift between Mr. Piperi and Heights. Because there is no demonstrable evidence to indicate that Mr. Piperi would be unfit to manage the new entity, the Court will not find him inappropriate to manage the new company. As such, there is no evidence to suggest that Mr. Piperi serving as chairman of the new MICO would unduly prejudice creditors. *In re Polytherm Indus., Inc.,* 33 B.R. 823, 829 (W.D.Wis.1983).

E. *Does the Plan unfairly discriminate against Heights?*

Heights asserts two arguments that the Plan unfairly discriminates against it. First, Heights argues that it is improperly placed in a class separate from other unsecured creditors. Second, Heights maintains that the Plan unfairly discriminates against it because other unsecured credi-

---

**9.** In *In re Greystone III Joint Venture,* 102 B.R. 560, 579–80, (Bankr.W.D.Tex.1989), Judge Clark concluded:

> The debtor's investors as a group are essentially "buying" the future risk of return, postponed in this case for ten years, for $500,000. Leaving that much money at risk for that long, in exchange for 100% of the reward at the end of that term is not at all unreasonable and full ownership under the circumstances is therefore justified given the long-term defer-

ral of any reward for the investment relative to the risk of loss being shouldered.

**10.** Mr. Piperi and the FSLIC entered into a consent decree which prohibited him from participating in any savings and loan ventures. The decree did not, however, find Mr. Piperi guilty of any wrongdoing, nor did Mr. Piperi make an admission of wrongdoing. An investigation may still be ongoing.

tors are paid in full and Heights is not.[11] In support of these contentions, Heights cites *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 152 (Bankr.S.D.N.Y.1984) for the proposition that a plan must not unfairly discriminate against a dissenting class of creditors. As such, "the holder of a claim or interest may not be singled out and subjected to unfair and discriminatory treatment." *Id.* at 152; *see also In re Johns–Manville Corp.*, 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986). The argument is twofold: (1) The Plan improperly *classifies* Heights' claim separately from other unsecured creditors under section 1122; and (2) the Plan unfairly *discriminates* against Heights and in favor of other unsecured creditors under section 1129(b)(1).

### 1. Improper Classification.

■ The concept of improper classification requires a consideration of both subsections of section 1122 and how they interact.[12] Courts initially construed the subsections narrowly, requiring that all unsecured claims of a similar nature be grouped together in one class. That notion was dispelled in *In re Ag Consultants Grain Div., Inc.*, 77 B.R. 665, 670–76 (Bankr.N.D. Ind.1987), and *In re Meadow Glen, Ltd.*, 87 B.R. 421, 424 (Bankr.W.D.Tex.1988), in which the courts found that section 1122 allows a claim or an interest to be placed in a particular class only if such claim or interest is substantially similar to the other claims or interests of that class, but all similar claims or interests are not required to be placed in the same class. Further, *Ag Consultants* held that plan classifications should only be questioned if not in the best interests of creditors, violative of the absolute priority rule, or if they created an unnecessary increase in the number of classes. *Ag Consultants*, 77 B.R. at 674.

The first two considerations are treated elsewhere in the opinion and there is no argument or evidence to suggest that the placement of Heights in a separate class uselessly increases the number of classes. As a result, the court in *Ag Consultants* concluded and this Court finds that section 1122 ultimately involves only two considerations with respect to claim classifications: (1) a plan proponent may have flexibility to place similar claims in different classes;[13] and (2) a plan proponent may not place dissimilar claims in the same class. *Id.* at 676. The classification scheme in the Plan is acceptable.

Moreover, with respect to the issue of impairment, the true consideration may not be whether the classification was unfair, but rather whether the *impairment* was unfair. As the Fifth Circuit noted in *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir.1985):

> Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of suc-

---

**11.** With respect to unsecured claims, the Plan provides:

> 4.06 *Class VI Claims, Trade Claims.*
> Trade Claims shall be paid in cash, in full, thirty (30) days after the Effective Date or, if later, on the date the claim is allowed. The source of the cash used to pay trade claims shall be part of the proceeds from the New Equity Investment–Primary.
> 4.07 *Class VII, Unsecured Claims.*
> Unsecured Claims shall be paid in cash, in full up to a total of $250,000, forty-five (45) days after the Effective Date or, if later, on the date the claim is allowed, by MICO, Inc. out of MICO, Inc. working capital and/or the New Equity Investment—Secondary. To the extent the allowed unsecured claims exceed the total of $250,000, the claimants shall be paid a *pro rata* distribution of $250,000 out of MICO, Inc.'s working capital and the New Equity Investment—Secondary. Any remaining claims will be paid *pro rata* with Heights out

of the Creditors' Trust. Any claims not satisfied out of the Creditors' Trust will be discharged.

**12.** Section 1122 provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

**13.** *See In re Jersey City Medical Center*, 817 F.2d 1055, 1061 (3d Cir.1987); *In re U.S. Truck Co.*, 800 F.2d 581, 585–87 (6th Cir.1986); *In re LeBlanc*, 622 F.2d 872 (5th Cir.), *reh'g denied*, 627 F.2d 239 (5th Cir.1980) (plan proponents have flexibility in classifying claims).

cess, the good faith requirement ... is satisfied. [T]hat the unsecured creditors' status was changed to effectuate the cramdown does not go to whether the purpose of the proposed plan is to reorganize or whether the plan has a reasonable hope of success. Congress made the cram down available to debtors; use of it to carry out a reorganization cannot be bad faith.[14]

### 2. Unfair Discrimination.

A finding that the plan *classification* scheme is proper does not necessarily resolve the question of *unfair discrimination.* As noted, the Plan proposes to pay the Class VI unsecured trade creditors in full within thirty (30) days, while affording Heights, as the largest unsecured creditor, a lien on the Retained Assets and a note payable over a twelve year pay period for only a portion of Heights' unsecured debt.

One commentator has noted that the concept of "unfair discrimination" under the Code is devoid of any particular meaning with respect to a dissenting class:

Nothing in the Code aids the determination of whether a plan "does not discriminate unfairly" with respect to a dissenting class. The legislative history states that the requirement "is included for clarity" and applies in the context of subordinated debentures. The requirement is intended to be complementary to the fair and equitable test and to permit the court to evaluate the complex relationship inherent in the relative priority of classes caused by partial subordination. In a nutshell, *if the plan protects the legal rights of a dissenting class in a manner consistent with the treatment of other classes whose legal rights are intertwined with those of the dissenting class, then the plan does not discriminate unfairly with respect to the dissenting class.*

Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 133, 141–42 (1979) (emphasis added, footnotes omitted).

Regardless, several bankruptcy courts have employed a broader construction of section 1129(b) as it relates to the concept of unfair discrimination. These courts have focused upon the disparate treatment a dissenting class or creditor receives under the proposed plan. *In re Future Energy Corp.,* 83 B.R. 470, 493 (Bankr.S.D.Ohio 1988); *In re Wieberg,* 31 B.R. 782, 785 (Bankr.E.D.Mo.1983). These cases have found that a dissident class must not only receive "fair and equitable" treatment, but must also receive treatment which allocates value to the class consistent with the treatment afforded other classes with similar legal claims. *In re Baugh,* 73 B.R. 414, 417 (Bankr.E.D.Ark. 1987); *see also In re Pullman Constr. Indus., Inc.,* 107 B.R. 909, 939 (Bankr.N.D. Ill.1989). For example, in *Greystone,* the plan allowed the trade debt precisely the same dividend as it did the Code-created deficiency claim. *Greystone,* 102 B.R. at 571–72. One recent Chapter 11 case analogized the ability of a debtor to discriminate under section 1322(b)(1) with section 1129(b) and restated a four-part test which is helpful in determining whether discrimination is fair:

(1) Whether the discrimination is supported by a reasonable basis;

(2) Whether the debtor can confirm and consummate a plan without the discrimination;

(3) Whether the discrimination is proposed in good faith; and

(4) The treatment of the classes discriminated against.

*In re Aztec Co.,* 107 B.R. 585, 590 (Bankr.

---

**14.** The plan in *Sun Country* was confirmed prior to the time that the Code was amended in 1984 to include the word "impaired" in section 1129(a)(10), thus requiring one impaired class to accept the plan. *Greystone,* 102 B.R. at 571 n. 13. Moreover, the Fifth Circuit in *Sun Country* stated in . *dicta* that where no impairment is necessary, "impairment" as opposed to classifi-

cation might be a bar to confirmation. *Meadow Glen, Ltd.,* 87 B.R. at 425. Additionally, the Fifth Circuit has suggested that impairment of a claim solely to satisfy the impaired acceptance requirement of 1129(a)(10) may not constitute good faith. *In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346, 1353 (5th Cir.), *reh'g denied,* 889 F.2d 663 (5th Cir.1989).

M.D.Tenn.1989).[15]

▇ These cases are instructive in ascertaining whether the disparate treatment of a dissenting class is "fair." Accordingly, for payment to be preferred to one creditor or class over others, the Court must find an articulable basis for the preference. Officers of MICO testified on both direct and cross examination that the immediate payment to the Class VI trade creditors was based upon the Debtors' desire to continue their business relationship, but admitted that new entities which could perform as capably as those claimants in Class VI could be obtained to act in a replacement capacity. No explanation was given for the immediate payment of up to $250,000.00 to Class VII unsecured creditors.

As such, the Court finds no demonstrable reason for the immediate payment in full of the Class VI unsecured trade creditors and the immediate payment in full of Class VII unsecured creditors up to $250,000.00, versus a partial payment to Heights over an extended period, other than to ensure Class VI and VII acceptance of the Plan. Accordingly, Heights' objection based upon "unfair discrimination" is sustained.

F. *Does the Plan fail to satisfy the "best interests of creditors" test?*

Section 1129(a)(7) provides:

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

▇ Under the best interests test as defined in section 1129(a)(7), the holder of a claim or interest must receive, in terms of present value, at least the amount which the holder would have received upon liquidation under Chapter 7. As such, the Court must make a determination of the value of the distributions under the plan in order to determine whether the claimant is receiving at least the equivalent of what would be received upon liquidation. *In re Neff,* 60 B.R. 448, 452 (Bankr.N.D.Tex. 1985), *aff'd,* 785 F.2d 1033 (5th Cir.1986). Heights believes that two fallacies exist within the liquidation analysis which fail the best interests test. First, the Plan does not propose to pay Heights in cash the present value of its claim against the Retained Assets on the effective date, but rather through a long-term retirement of that debt through the execution and payment of the Heights note. Because the note is not being paid at a market rate of interest, Heights argues that the note is worth far less in value than its face amount, and thus the present value of the payout is accordingly reduced. *In re Edgewater Motel, Inc.,* 85 B.R. 989, 995 (Bankr.

---

**15.** *Aztec* provides an exhaustive study of the parameters a court may consider in a Chapter 11 case in determining whether the discrimination as to payment has a justifiable and reasonable basis. The *Aztec* court concluded that there are articulable reasons for preferred payments to a class or claimant, such as child support payments or the maintenance of a continuing relationship with necessary business creditors. This reasoning may be a function of public policy considerations, premised upon state statutes which recognize such a preference or where courts have made a determination that such a preference is in the interests of all creditors. *See In re Storberg,* 94 B.R. 144 (Bankr.D. Minn.1988). As such, absent demonstrable evidence by the debtor of the *need* for the preferred payment to one creditor over others who possess similar claims, there appears to be no reason to allow such a provision. It should be noted that Chapter 13 combines unfair discrimination with classification, a connection not directly made in Chapter 11. *Greystone,* 102 B.R. at 571, n. 15.

E.D.Tenn.1988) (within the context of a Chapter 11 case present value assumes a current market rate of interest). Heights further contends that the Debtors have failed to estimate the present value of the plan payments. *Neff,* 60 B.R. at 452 (creditors must receive distributions under plan with a present value equal to what they would receive under a chapter 7 liquidation).

Second, Heights believes the Debtors' liquidation analysis is further flawed in that the IRS tax claims are treated in full as priority claims. Heights contends that under a chapter 7 liquidation, much of the tax claims would be subordinated to those of unsecured creditors under section 726(a)(4).

The Debtors respond that the overwhelming *number* of creditors have voted to approve the Plan and that this fact inferentially rebuts the notion that the Plan is not in the best interests of all creditors. Further, the Debtors argue that the stated rate of interest is fair, noting that in *Edgewater* the creditor was oversecured, thus requiring him to be paid a market rate of interest. *Edgewater,* 85 B.R. at 990, nn. 4 & 5; *see* section 1129(b)(2)(A)(i). Moreover, because Heights' claim is undersecured, the Debtors argue that Heights should receive in present value only what it would receive under a chapter 7 liquidation. The Debtors maintain that *any* return Heights receives from a Chapter 11 plan is much more significant than a return through liquidation. Thus, under a *value* argument, the Debtors assert that they have presented credible evidence that Heights will receive the present value of its claim equal to

or in excess of a chapter 7 liquidation on the date of confirmation.

The Debtors have discounted two important considerations in their argument. First, while *value* represents an amorphous concept, the Debtors fail to give any weight to the element of who will *control* MICO and Elpor.[16] Obviously, control means everything to the Debtors, as evidenced by Mr. Piperi's offer to infuse cash capital to receive the equity ownership. Conversely, Heights makes a strong argument that if the Debtors were liquidated, Heights would gain *control* of everything. Because of its status as the Debtors' major secured and unsecured creditor, liquidation would result in foreclosure on the MICO stock and effectively vest ownership of MICO in Heights. Thus, "best interests" is not only a question of *balance sheet value,* but also the value of *control* of the company and its $108,000,000.00 in assets. The Debtors have failed to fully account for this factor in the Plan.

Second, the Debtors' response to the priority tax question is contradictory. During the Plan confirmation hearing, the Debtors argued that regardless of the extent of the IRS tax claims, the Plan provides a mechanism to make full payment upon the Court's determination of the amount. Upon posthearing submission of briefs, the Debtors argued that a capital infusion was necessary in the event that the IRS claim is allowed in full. The Debtors have entangled themselves in the web of the purpose of the "capital infusion exception." If all claims can be fully paid through the Plan, then there is no need for any capital infusion, absent a necessity for working capital for operating expenses. Further, if work-

---

16. Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains "property." Whether the value is "present or prospective, for dividends or only for purposes of control" a retained equity interest is a property interest to "which the creditors [are] entitled ... before the stockholders [can] retain it for any purpose whatever." *Northern Pacific R. Co. v. Boyd,* 228 U.S. [482], 508, 33 S.Ct. [554], 561 [57 L.Ed. 931 (U.S.Wash.1913)]. Indeed, even in a sole proprietorship, where "going concern" value may be minimal, *there may still be some value in the control of the enterprise;* obviously, also at issue is the interest in

potential future profits of a now-insolvent business....

\* \* \* \* \* \*

... And there is great common sense in petitioners' contention that "obviously, there is some going concern value here, or the parties would not have been litigating over it for the last three years."

*Ahlers,* 108 S.Ct. at 969–70 (citations omitted, emphasis added); *see also In re Pecht,* 53 B.R. 768, 13 C.B.C.2d 973, 978 (Bankr.E.D.Va.1985) (control of reorganized entity a valuable asset which cannot be retained by junior class when unsecured creditors receive nothing).

ing capital is needed, it is to go towards the operation of the Debtors' business, not the payment of claims. To allow otherwise would permit the Debtors to infuse new capital for the sole purpose of purchasing votes of an impaired class in order to reach cramdown.

Therefore, the Plan fails under the "best interests" test because Heights would receive more "value" in a liquidation than under the Plan.

### G. The "Fresh Capital" Exception and the Absolute Priority Rule.

The crux of this Court's consideration of the Debtors' proposed Plan is whether the "fresh capital" exception to the absolute priority rule may be utilized by the Debtors to retain Mr. Piperi's equity control under the Plan. The concept of the capital infusion exception is neither novel nor difficult to understand, deriving its lineage from early railroad cases and subsequent Supreme Court opinions in Case and Ahlers. The problem with the Debtors' usage of the capital infusion exception is how it relates to the viability of their proposed Plan. As will be seen, most reported cases concerning a capital infusion relate to the type of capital which qualifies under the capital infusion exception, or the substantiality of the value. Few reported cases have considered the *necessity* of the capital infusion and how it relates to the structure of the plan of reorganization. Naturally, the fundamental issue is what is required by the absolute priority rule.

#### 1. Development of the absolute priority rule.

The absolute priority rule, distilled to its basic components, requires that senior claims be paid in full before any junior class can receive or retain any property. *Ahlers*, 108 S.Ct. at 966; Peeples, *Staying In: Chapter 11, Close Corporations and the Absolute Priority Rule*, 63 Am.Bankr. L.J. 65, 72 (1989). The absolute priority rule originates from the enactment of section 77B(f) of the Bankruptcy Act of 1898,[17] tracing its development from railroad reorganization cases.[18] As noted by the Supreme Court in *Louisville Trust Co.*, 174 U.S. at 684, 19 S.Ct. at 830, "any arrangement of the parties by which the subordinate rights and interests of stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation." The basis of the rule was not strictly statutory in nature but rather arose from the federal courts' exercise of equity jurisdiction. Peeples, *supra* at 73.

In 1939, the connection between old equity cases and bankruptcy practice was made explicit. In *Case v. Los Angeles Lumber Prod. Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), the Supreme Court held that under section 77B(f), a fair and equitable plan of reorganization meant application of the absolute priority rule. *Case*, 308 U.S. at 116–17, 60 S.Ct. at 7–8. In *Case*, existing shareholders of the debtor sought to retain an ownership interest in the company, even though senior creditors were not to be paid in full. The shareholders argued that the retention of their interests was important to the future success of the company, given their familiarity with the operations of the business and the advantages of continuity in management. *Case*, 308 U.S. at 112–113, 60 S.Ct. at 5–6. As such,

---

**17.** Section 77B(f) of the Bankruptcy Act of 1898 stated:

> After hearing such objections as may be made to the plan, the judge shall confirm the plan if satisfied that (1) it is fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders....

Section 77B(f) became section 221(2) under the Chandler Act of 1938.

**18.** *See Kansas City Terminal Ry. v. Central Union Trust Co.*, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926); *Northern Pac. Ry. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913);

*Louisville Trust Co. v. Louisville N.A. & C. Ry.*, 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 (1899). These cases held that the doctrine of "fair and equitable" was a term of art which meant that existing stockholders could not participate in the reorganized debtor unless all senior creditor claims were paid in full. This doctrine is followed in *Ahlers*, 108 S.Ct. at 966, in which the Supreme Court held "a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property."

the Supreme Court found that there are occasions where continued shareholder participation in the ownership of an insolvent company is acceptable.[19]

The Supreme Court in *Case* concluded that the ability of existing shareholders to make new contributions in exchange for equity ownership was to be limited by stringent conditions. The Court recognized that whatever assessments are requested must be adjusted to accord the creditor the full right of priority against the corporate assets. As such, the contribution must be "reasonably equivalent" in value to the continued participation of the stockholders and it must be a contribution in "money or in money's worth." *Id.* at 122, 60 S.Ct. at 10. Second, *Case* also imposed the additional requirements that the contribution must be both "fresh" and "necessary" to the reorganization. The Supreme Court concluded, however, that while the fresh capital exception may be appropriate in certain circumstances, it was inappropriate in

*Case* because the expertise and reputation of the contributing stockholders were incapable of being valued. *Id.* at 122, 60 S.Ct. at 10. Therefore, the Supreme Court has recognized that the exception to the absolute priority rule will be allowed only if the capital infusion meets the conditions imposed by the *Case* decision.

2. Is the *Case* capital infusion exception available after *Ahlers?*

■ A controversy exists as to whether the fresh capital exception survived the passage of the Bankruptcy Code of 1978.[20] *Greystone* held that notwithstanding any confusion caused by the footnote in *Ahlers,* the fresh capital exception is still good law.[21] *Greystone,* 102 B.R. at 574–75.[22] This Court agrees with *Greystone* that the capital infusion exception still exists notwithstanding the Supreme Court's avoidance of the issue in footnote three of *Ahlers.*[23] As such, this Court's decision turns

---

**19.** It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor.... Where that *necessity* exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.
*Case,* 308 U.S. at 121, 60 S.Ct. at 10 (emphasis added).

**20.** The Supreme Court stated in *Norwest Bank Worthington v. Ahlers,* 108 S.Ct. at 967, n. 3:
The United States, as *amicus curiae,* urges us to reverse the Court of Appeals ruling and hold that codification of the absolute priority rule has eliminated any "exception" to that rule suggested by *Los Angeles Lumber,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939) ... Relying on the statutory language and the legislative history, the Solicitor General argues that the 1978 Bankruptcy Code "dropped the infusion-of-new-capital exception to the absolute priority rule...."
We need not reach this question to resolve the instant dispute ... [W]e think it clear that even if the *Los Angeles Lumber* exception to the absolute priority rule has survived enactment of the Bankruptcy Code, this exception does not encompass respondents' promise to contribute their "labor, experience, and expertise" to the reorganized enterprise.
Thus, our decision today should not be taken as any comment on the continued vitality of the *Los Angeles Lumber* exception—a question which has divided the lower courts since passage of the Code in 1978.

**21.** One court has argued that failure to recognize the continuing vitality of the *Case* exception would, in effect, deny the prospect of Chapter 11 reorganization to small or close corporations. *Pullman Constr. Indus.,* 107 B.R. at 947.

**22.** *Greystone* involved a single asset real estate Chapter 11 reorganization which required consideration of a section 1111(b) election. Although factually different, the analysis in *Greystone* regarding the capital infusion exception is applicable to this case.

**23.** A preponderance of post-Code decisions agree with this posture. *See, e.g., In re U.S. Truck Co.,* 800 F.2d 581 (6th Cir.1986); *In re Potter Material Serv., Inc.,* 781 F.2d 99 (7th Cir. 1986); *In re 222 Liberty Assoc.,* 108 B.R. 971 (Bankr.E.D.Pa.1990); *In re Pullman Constr. Indus.,* 107 B.R. 909 (Bankr.N.D.Ill.1989); *In re Johnson,* 101 B.R. 307 (Bankr.M.D.Fla.1989); *In re Snyder,* 99 B.R. 885 (Bankr.C.D.Ill.1989); *In re Sawmill Hydraulics, Inc.,* 72 B.R. 454 (Bankr. C.D.Ill.1987). *Contra, In re Drimmel,* 108 B.R. 284, 288–90 (Bankr.D.Kan.1989) (*Case* exception impliedly repealed by enactment of Bankruptcy Code); *In re Winters,* 99 B.R. 658 (Bankr.W.D. Pa.1989) (*Case* did not survive enactment of the Bankruptcy Code of 1978); *In re Rudy Debruycker Ranch, Inc.,* 84 B.R. 187 (Bankr.D. Mont.1988) (If one were to accept the *Case* exception, the capital contribution must result in 100% payout of unsecured creditors. Therefore, *Ahlers* implies that there are no exceptions to the absolute priority rule); Powlen and Wuhrman, *The New Value Exception to the Ab-*

on whether or not the capital infusion offered in this instance satisfies the conditions imposed by *Case* and subsequent decisions.

3. Is Mr. Piperi's capital infusion necessary to the reorganization of Elpor and MICO?

 There are several aspects to the *Case* exception which must be considered when a court evaluates whether or not the capital infusion exception should be allowed.[24] Only one of those considerations must be determined here: Is the capital infusion in this situation *necessary* to the reorganized debtor? The requirement of whether or not the new contribution is necessary has not been fully explored by post-Code examination of the capital infusion exception. *See e.g., In re U.S. Truck Co.,* 800 F.2d 581, 588 (6th Cir.1986) (contribution must be substantial and essential); *In re Potter Material Serv., Inc.,* 781 F.2d 99 (7th Cir.1986) (Seventh Circuit refused to consider the necessity aspect of *Case* because this issue had not been previously raised in the lower courts); *In re Stegall,* 85 B.R. 510 (C.D.Ill.1987), *aff'd,* 865 F.2d 140 (7th Cir.1989) (bankruptcy court considered whether debtor's contribution of personal services was "up front," and "money's worth," but not whether they were necessary); *In re Sawmill Hydraulics, Inc.,* 72 B.R. 454 (Bankr.C.D.Ill.1987) (court considered "value" of debtor's personal guarantee on new financing for capital contribution, but not necessity of contribution). The requirement also stems from the Supreme Court's decision in *Consolidated Rock Prod. Co. v. DuBois,* 312 U.S. 510, 529 n. 27, 61 S.Ct. 675, 85 L.Ed. 982 (1941), in which the Court noted "it should have been shown that there was a necessity of seeking new money from [the contributing shareholders]." Further, an unan-

swered question in this consideration is whether the debtor's equity holders should be the only available source of funds for the infusion.[25]

*Greystone* concluded that the capital infusion exception serves "the narrow purpose of affording the debtor the capital necessary to survive." *Greystone,* 102 B.R. at 575; *accord, 222 Liberty Assoc.,* 108 B.R. at 984 (Bankr.E.D.Pa.1990). Moreover, *Greystone* recognized that the capital infusion exception "is not intended as a device by which pre-filing owners can buy their way back into the venture, much less preserve their ownership interest." *Id.* at 575; *In re Potter Material Serv., Inc.,* 781 F.2d at 102 (a showing that the contribution was not necessary or that the shareholders were not the only available source of funds would require a court finding of whether the plan was "fair and equitable"). Further, requiring a rigorous showing of both necessity and substantiality will assure the court that a debtor's equity holders are not eviscerating the absolute priority rule by means of a gratuitous, token cash infusion used primarily to buy cheap financing. *Greystone,* 102 B.R. at 575 (citing *Group of Inst. Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R.,* 318 U.S. 523, 570, 63 S.Ct. 727, 751, 87 L.Ed. 959, 1010 (1943)).

 In addition, *Greystone* noted that "[i]f a cash infusion is not necessary to the reorganization effort, the debtor will have failed to have raised the predicate equitable concern that motivated resort to the exception in *Kansas City Terminal* and *Case.*" *Id.* As such, the court should only entertain the *Case* exception to the absolute priority rule in those situations in which the reorganizing enterprise needs the capi-

---

*solute Priority Rule: Is Ahlers the Beginning of the End?,* 93 Comm.L.J. 303 (1988).

**24.** These considerations require the court to determine whether or not the capital infusion was new, substantial, necessary, reasonably equivalent, and for money or money's worth. *Case,* 308 U.S. at 121–22, 60 S.Ct. at 10.

**25.** Few cases have considered whether or not a participating creditor would have the right to bid and offer its own capital infusion. *Greystone,* 102 B.R. at 577, n. 22; *In re Landau Boat Co.,* 13 B.R. 788 (Bankr.W.D.Mo.1981); *see also* Levin, *Retention of Ownership Interest Over Creditor Objection—How Intangible and Unsubstantial May the Substantial Contribution Be?,* 92 Comm.L.J. 101 (1987).

tal investment in the first place.[26] To do otherwise would allow the capital infusion exception to swallow the absolute priority rule, and the exception could be used merely as a device to retain an equity interest in the venture. *Greystone*, 102 B.R. at 576–77; *see also Sawmill Hydraulics, Inc.*, 72 B.R. at 456 (court noted that even if unsecured creditors would receive more under a Chapter 11 plan than through a liquidation, this did not prevent court from considering plan not "fair and equitable" because reorganized debtor would retain interest at expense of not paying unsecured creditors in full).

■ The analysis in *Greystone* is applicable in this case. There is sufficient cash on hand to pay the unsecured creditors, with the exception of Heights. Moreover, there has been no showing by the Debtors that the capital infusion by Mr. Piperi is going to be used for any purpose other than the payment of the unsecured creditors. There has been no requisite showing by the Debtors that the capital infusion is necessary for the continued operation of the Debtors. The Debtors' posthearing argument that the capital infusion may additionally be needed to pay off the IRS tax claims is not consistent with the evidence at the confirmation hearing. Regardless, it appears to this Court that the sole purpose for Mr. Piperi to infuse capital is to retain control of the equity ownership under the Plan without the payment in full of a dissenting creditor class. There is no indication that the capital infusion is necessary for the *continued operations* of the business.

The Court has serious doubts as to the supposed benefit that the capital infusion will afford the Debtors other than paying off Class VI and VII claimants. If the Court were to allow Mr. Piperi to "purchase" the claims of classes of creditors, the signal of this decision would be that equity holders could purchase back their interest in a reorganized debtor by using a new capital injection to buy votes. This contravenes the purpose of the absolute priority rule and the equitable considerations found in both *Boyd* and *Case*. The capital infusion exception may only be used in those instances where the capital is *necessary* for the continued operations of the debtor.[27] It is not merely a mechanism for existing equity holders to buy back, at bargain prices, their ownership interest in the reorganized debtor.

## CONCLUSION

As a consequence, the Court finds in this case that the capital infusion is not necessary to the reorganized debtor. Accordingly, the Plan violates the absolute priority rule of section 1129(b) because no exception exists to allow junior interest holders such as Mr. Piperi to receive or retain an interest while Heights is not paid in full. Further, the Plan fails because of the disparate treatment Heights would receive under the Plan payout. Other unsecured creditors are being paid in full almost immediately while Heights must wait twelve years for partial payment. Finally, the Plan does not satisfy the "best interests of creditors" test because it does not afford Heights the value of its immediate right of "control" if the Debtors were liquidated today as opposed to the realization of a portion of its claim from the present time until the year 2002.

For the reasons stated herein, confirmation of the Plan is denied. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Bankr.R. 7052. An Order Denying Confirmation has been rendered.

---

**26.** The Sixth Circuit has concluded that the bankruptcy court must find that the contribution is necessary and "sufficient to make the plan work." *U.S. Truck Co.*, 800 F.2d at 590. The Debtors argue that the infusion may also be necessary because funds on deposit tied up in litigation may be lost. The *Case* exception is not a vehicle to "bond" reorganizing debtors who might anticipate losses in litigation.

**27.** "As the courts have noted, the purpose of the injection of new capital is an effort to continue the working of and generating income from the operation … in order *to pay all* the outstanding claims of the debtors." *Stegall*, 85 B.R. at 515 (emphasis added).